**COMMUNIST PARTY OF THE UNITED STATES of America, Petitioner,**

v.

**SUBVERSIVE ACTIVITIES CONTROL BOARD, Respondent.**

No. 11850.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 21, 1954.

Decided Dec. 23, 1954.

Petition for Rehearing Denied Jan. 14, 1955.

Writ of Certiorari Granted May 31, 1955.

See 75 S.Ct. 872.

Mr. Vito Marcantonio, New York City (who died subsequent to the argument), Mr. John J. Abt, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, and Mr. Joseph Forer, Washington, D. C., for petitioner.

Miss Beatrice Rosenberg, Atty., Department of Justice, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, Mr. George R. Gallagher, Gen. Counsel, Subversive Activities Control Board, and Mr. David B. Irons, of the bar of the Supreme Court of Texas, pro hac vice, by special leave of Court, with whom Mr. Frank R. Hunter, Jr., Asst. Gen. Counsel, Subversive Activities Control Board, Messrs. Harold D. Koffsky and Carl H. Imlay, Attys., Department of Justice, and Messrs. Leo M. Pellerzi and Ned O. Heinish, Attys., Subversive Activities Control Board, were on the brief, for respondent. Mr. William A. Paisley, Atty., Department of Justice, entered an appearance for respondent.

Before PRETTYMAN, BAZELON and DANAHER, Circuit Judges.

PRETTYMAN, Circuit Judge.

This is a petition to review an order of the Subversive Activities Control Board, which holds that petitioner is a Communist-action organization within the meaning of the Subversive Activities Control Act of 1950 [1] (Section 3) [2] and as such must register pursuant to

1. This Act is Title I of the Internal Security Act of 1950, 64 Stat. 987 et seq.

2. 64 Stat. 989, 50 U.S.C.A. § 782.

the provisions of that Act.[3] The proceeding before the Board was initiated by a petition filed by the Attorney General. Testimony was received by a panel of the Board, the Attorney General presenting twenty-two witnesses and the Party-respondent three witnesses. Documentary evidence was introduced, briefs, proposed findings, and reply briefs were filed, and oral argument was heard. The panel issued a recommended decision, and exceptions to it were filed. Oral argument was had before the full Board, and the Board issued a report and the order here under review.

Petitioner's attack is in three parts, one on the Act itself, one on the order of the Board, and the third on "other reversible errors". In Part One of petitioner's brief the Act is asserted to be invalid upon four grounds. These are: The Act is an outlawry statute, designed to outlaw the Communist Party by legislative fiat; the Act violates the due process clause and is also a bill of attainder; the Act violates the constitutional prohibition against compulsory self-incrimination; and the Act violates the First Amendment. In Part Two of the brief the order of the Board is said to be invalid upon three grounds. The first ground is that the Board so applied the provisions of Section 13(e)[4] of the Act as to magnify their irrationality. The second ground is that the Board violated the First Amendment. The third ground is that the Board members were subjected to extra-legal pressures and were biased. Part Three of the brief presents six additional assertedly reversible errors. They are: (1) The order is based upon conduct prior to the Act; (2) the Board's findings as to petitioner's pre-Act conduct are based upon incompetent and discredited evidence; (3) the findings with reference to the world Communist movement are not supported by evidence; (4) the findings with reference to the facts are not supported by a preponderance of the evidence; (5) the order must be set aside if it is invalid upon any ground; and (6) the appointments to the Board were made in violation of the Constitution.

We shall not follow petitioner's arrangement of its contentions, but in the course of our consideration we will deal with them all. Because this is a case of first impression, involving a new statute of importance, and because the points of both law and fact are many and vigorously pressed, our discussion will be at some length.

We look first at the statute. It opens with findings of the existence and the nature of "a world Communist movement" in a long recitation of fifteen paragraphs dealing with the nature of the movement abroad and in the United States. The Act defines a Communist-action organization. It declares certain actions to be unlawful. These actions are three in number: (1) for any person to agree with another person to contribute to the establishment in this country of a totalitarian dictatorship controlled by a foreign organization (except by constitutional amendment); (2) for an officer or employee of the United States to communicate to any agent of a foreign government or of any Communist organization any information classified as affecting the security of this country; and (3) for any foreign or Communist agent to receive such information. The next two sections of the Act contain certain prohibitions directed to members of organizations registered under the Act. Then the Act requires the registration of Communist-action and Communist-front organizations, annual reports from such organizations, and registration of members of Communist-action organizations. It provides that the Attorney General keep public registers of Communist organizations. The Act prohibits certain privileges to registered organizations. It establishes the Board and provides for proceedings be-

3. 64 Stat. 993, 50 U.S.C.A. § 786.

4. 64 Stat. 999, 50 U.S.C.A. § 792(e).

fore it. It delineates a series of considerations which must be made by the Board. It provides for judicial review. Penalties for violation of the Act are provided. A series of amendments to other statutes, such as the Nationality Act of 1940 and the Alien Registration Act of 1940, are made. The last section of the Act is a separability provision.

I

■■■ We reject the Government's contention that we must consider the statute as a registration measure only. The argument is that: The several statutory provisions are separable; the Board's power is to require registration and no more; its order does no more than that; therefore the statute and the order must be treated by us as involving registration and no more. It is true that the provisions of this statute are separable. The Act contains a separability section [5] reading:

> "Sec. 32. If any provision of this title, or the application thereof to any person or circumstances, is held invalid, the remaining provisions of this title, or the application of such provision to other persons or circumstances, shall not be affected thereby."

And so, if one provision of this Act is invalid, its fall would not necessarily drag down the remainder of the Act; all other provisions would remain unaffected. But that is not the point of the Government's contention. The Government contends that each provision,[6] even if all are valid, must be treated separately from the others, as though each were an independent enactment unrelated to the others. The question whether one section of a statute can

stand when other sections are invalid, and the question whether one valid section of a statute can be treated separately and independently of all other valid sections, are two different questions. The former would raise a separability question. The latter is governed by the elementary rule that a statute must be considered as a whole, in its entirety, all parts together.[7] The Government's argument is, in effect, that this statute is not an integrated unit but is a collection of separate measures. But we think this is not that sort of statute. The mandatory provisions, called "sanctions" in this litigation, in Sections 5, 6, 10 and 11,[8] are attached directly to registration. For example, if an organization is registered, or ordered to register, its mail must be marked and its broadcasts identified. We cannot strip the registration of its attachments. We cannot consider the registration requirement as though it were bare, when it is not bare either in the statute or in factual consequences.

The Government relies upon Electric Bond & Share Co. v. Securities and Exchange Commission.[9] That case involved the validity of those sections of the Utility Holding Company Act, 15 U.S.C.A. § 79 et seq., which required registration. It was urged that those sections and various other control provisions were an integrated whole and had to be considered together, as though interdependent one upon the other. The Supreme Court held that both the structure of the Act and the intent of Congress were clear that each provision had a purpose and effect of its own, that the provisions constituted groups of regulations, and that as a practical matter they could be sustained and en-

---

**5.** Section 32, 64 Stat. 1019, 50 U.S.C.A. § 781 note.

**6.** The Government agrees that the disclosure of information required by Section 7(d) may well be considered with the registration requirement.

**7.** Crawford, Statutory Construction § 165 (1940); cases collected and cited at 50 Am.Jur., Statutes § 352.

**8.** "Sanctions" were also imposed by Sections 22 and 25 upon alien members of a registered organization, but those sections have been superseded by the Immigration and Nationality Act of June 27, 1952, 66 Stat. 163, 8 U.S.C.A. §§ 1182, 1251, 1424, 1451.

**9.** 1938, 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936.

forced separately. It held that the statute was not an integrated unit. We think the statute now before us is an integrated unit, although invalid sections may be excised. We must treat the registration requirement as though it involves the sanctions in Sections 5, 6, 10 and 11.[10]

We later point out that Section 8, providing for registration by individual members of an organization, is not attached to organization registration but on the contrary applies when the organization does not register. We think it a separate measure from organization registration.

In the disposition of the problems presented to us we will follow the course indicated by the foregoing. We will consider the so-called "sanction" and other provisions which depend upon or flow from registration of the organization. In so far as such sections are valid we will treat them as integrated with the registration requirement and thus involved in the order before us. In so far as any of such provisions are invalid they may be excised, being severable, and the valid remainder will constitute the integrated unit. We will lay aside consideration of provisions which do not depend upon organization registration but are in lieu of or take effect in the absence of such registration. Factual bases for consideration of such sections are not before us.

 We also quickly dispose of contentions by petitioner that the statutory procedures, as procedures, are inadequate or otherwise invalid. Full administrative hearing (Section 13) full findings (Section 13) and full judicial review (Section 14) are provided. There is no insufficiency in this respect so far as the statute is concerned.

## II

The basic provision of the statute, as it concerns the present litigation, is that a Communist-action organization must register with the Attorney General. Such an organization is defined by the statute [11] as follows:

"(3) The term 'Communist-action organization' means—

"(a) any organization in the United States (other than a diplomatic representative or mission of a foreign government accredited as such by the Department of State) which (i) is substantially directed, dominated, or controlled by the foreign government or foreign organization controlling the world Communist movement referred to in section 2 of this title, and (ii) operates primarily to advance the objectives of such world Communist movement as referred to in section 2 of this title; and

"(b) any section, branch, fraction, or cell of any organization defined in subparagraph (a) of this paragraph which has not complied with the registration requirements of this title."

Congress defined "the world Communist movement" in several paragraphs in Section 2 of the statute. It is enough for our purposes to quote paragraph (1):

"(1) There exists a world Communist movement which, in its origins, its development, and its present practice, is a world-wide revolutionary movement whose purpose it is, by treachery, deceit, infiltration into other groups (governmental and otherwise), espionage, sabotage, terrorism, and any other means deemed necessary, to establish a Communist totalitarian dictatorship in the countries throughout the world through the medium of a world-wide Communist organization."

 For the purpose of testing the validity of the statute itself, as a statute, we must assume that the conditions with

---

10. See note 8, supra.

11. Section 3, 64 Stat. 989, 50 U.S.C.A. § 782.

which it purports to deal actually exist. The question upon validity is: If the conditions recited in the statute as necessary requisites for action under the statute do actually exist, is the statutory plan for dealing with them valid? The question whether a certain organization is subject to the statute is a different and separate question.

██ We turn first to the general power of government in the premises. Antipathy to domination or control by a foreign government, or even to interference on the part of a foreign government, is a basic policy in this nation. It was one of the compelling reasons for the making of the Constitution in replacement of the Confederation. Frequent references were made to it in the Constitutional Convention. Mr. Madison went all the way back to the intrigues practiced among the Amphictionic Confederates by the kings of Persia as a citation of the danger of foreign interference.[12] It was the premise of the action of the Government, through President Washington, in respect to Citizen Genet. It ran through the War of 1812 and the Monroe Doctrine, the fight over the League of Nations, and down to such qualms as there are concerning the United Nations. This country has always unequivocally repudiated any action which has seemed to contain the element of foreign control over our governmental affairs. To declare unconstitutional a statute which would require the registration of an organization, substantially directed, dominated or controlled by a foreign government or by an organization such as the world Communist movement defined in this statute, would be to deny one of the purposes and one of the best-established policies of the government which was created by the Constitution. This is true whether or not the foreign government is coupled with a particular movement.

██ Self-preservation is a high prerogative of any sovereignty. "Security against foreign danger is one of the primitive objects of civil society," wrote James Madison in the Fortieth Federalist paper. And he continued, "It is an avowed and essential object of the American Union." It seems to us that, however high in priority the right of self-preservation is among the prerogatives of sovereign powers in general, it is peculiarly so in respect to the Federal Government presently established in this country. As we conceive the matter, the government established by our Constitution is an instrument for service, particularly for the protection of the security of the people whose servant it is; it is a working tool the value of which lies in its usefulness. It was established by the people themselves; it did not arise of its own accord; it was not imposed from without. Since it was created by the people for the security of the people, especially against foreign encroachment, it has supreme duties both to protect its own existence and to insure that unidentified efforts on behalf of foreign agencies devoted to its disestablishment do not occur. It seems clear beyond question that, if the conditions described in this statute do actually exist, the presently existing Federal Government has power to prohibit within its borders activity of the sort described; *a fortiori* it has power to require identification of such activities and to impose conditions short of proscription. If there is a world movement for the destruction of all presently existing national governments and for the establishment of a world dictatorship under Communist auspices, and if a given organization in this country is actually under the control of the leaders of that movement and is acting to achieve its objectives, we perceive no reason why the presently existing government in this country should not prohibit the unidentified activity of such an organization or withdraw from its members protections and privileges otherwise afforded by that government.

12. 1 Farrand, Records of the Federal Convention 319 (1911).

We perceive no basic reason why that government must stand helpless before activities such as those described in this statute.

### III

We come next to the place of the First Amendment in our problem. The initial inquiry is a general question whether the subject matter of the statute is such that impingement upon First Amendment rights may be imposed. If the answer to that query be affirmative, the next inquiry is a specific question whether the restrictions imposed by the statute are reasonably calculated to effectuate the remedial purposes being sought and so are valid although impingements upon the protected rights. We discuss this latter question later in this opinion.

We make the same assumption here that we made in Barsky v. United States.[13] We assume, without deciding, that this statute will interfere with freedoms of speech and assembly. It does not interfere in terms, but we think a realistic view must be taken of restrictions on First Amendment freedoms, and realistically the registration and sanction provisions will erect restrictions upon what otherwise might be a wider latitude of expression. The problem is whether the restrictions imposed are valid in this situation.

In the Party's argument an effort is made to cast the entire controversy over Communism into the form of an ideological or philosophical difference of opinion. It is true that there are such differences of opinion in respect to Communism, and controversy does rage in ideological and philosophical circles. But the problem before us deals with government, and government has intensely practical as well as theoretical aspects. Its aspects may be freely discussed in philosophical dissertations, but in the field of action a government must be realistic and factual. The right to free expression ceases at the point where it leads to harm to the Government. The epigram which has become classic as a designation of that point is "clear and present danger". When danger to government is clear and present, the right of unrestricted speech gives way as do the other basic rights of liberty and life. The "clear" in that epigram is not limited to a threat indubitably etched in every microscopic detail. It includes that which is not speculative but real, not imagined but actual. The "present" in the epigram is not restricted to the climactically imminent. It includes that which exists as contrasted with that which does not yet exist and that which has ceased to exist.

The activities of a world Communist movement such as that described in this statute and of organizations in this country devoted to its objectives constitute a clear and present danger within the meaning of any definition of the point at which freedom of speech gives way to the requirements of government security. The basic theory of Communism that all presently existing nationalist governments be superseded by a stateless world organization under a proletarian dictatorship, the domination of one world power with all its assets by the Communists, the succession of national capitulations to the forces of that group, and the declared intentions of its leaders in respect to the remainder of the world, are reflected in the recitations in this statute and, moreover, are historic facts which cannot be disputed. We cannot at the present time treat the program and policies of the world Communist movement as a dialectic debate.

A few references will support the proposition. In the Dennis case[14] the Supreme Court considered the statute

---

13. 1948, 83 U.S.App.D.C. 127, 167 F.2d 241, certiorari denied 1948, 334 U.S. 843, 68 S.Ct. 1511, 92 L.Ed. 1767.

14. Dennis v. United States, 1951, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137.

(known as the Smith Act) in which Congress made it unlawful for any person knowingly or wilfully to advocate, etc., the desirability, etc., of overthrowing any government in the United States by force or violence or to organize any society of persons who teach such overthrow. Holding that the power of Congress to protect the Government is beyond question, the Court said: "The question with which we are concerned here is not whether Congress has such *power*, but whether the *means* which it has employed conflict with the First and Fifth Amendments to the Constitution." [15] It held that the Government need not wait "until the putsch is about to be executed"; [16] that, if the Government is aware that a group aiming at its overthrow is attempting to indoctrinate its members and to commit them to a course whereby they will strike when the leaders feel the circumstances permit, action by the Government is required. An attempt to overthrow the Government by force, the Court held, even though doomed from the outset, is a sufficient evil for Congress to prevent, and a conspiracy to advocate, as distinguished from the advocacy itself, can be constitutionally restrained, because the existence of the conspiracy creates the danger.

▇▇▇ Moreover, the right to unimpeded expression of views does not apply to unimpeded conduct. That the protection which surrounds speech does not encompass action is well established. Thomas v. Collins [17] is a sufficient citation. Thomas had been committed for contempt for violating an order of a Texas court. Texas by statute required labor union organizers to secure organizers' cards before soliciting members. A mass meeting had been arranged in a compaign to organize employees at a plant near Houston. Thomas was to address the meeting. He was served with an order of the court, which mentioned the prospective speech and enjoined him from soliciting memberships without an organizer's card. The Supreme Court held that "a requirement that one must register before he undertakes to make a public speech to enlist support for a lawful movement is quite incompatible with the requirements of the First Amendment." [18] But the Court went on to say:

"Once the speaker goes further, however, and engages in conduct which amounts to more than the right of free discussion comprehends, as when he undertakes the collection of funds or securing subscriptions, he enters a realm where a reasonable registration or identification requirement may be imposed." [19]

If the mere solicitation of funds for a lawful cause is sufficient conduct to validate the restrictive police power of a state, operation to achieve the objectives of a movement such as this statute describes is conduct sufficient to invoke federal regulatory power.

▇▇▇ Clearly the aim of the statute before us is at action and conduct rather than at mere speech and assembly. A purpose to establish a totalitarian dictatorship, posited in paragraph (1) of Section 2 of the Act,[20] is itself a program of action rather than of mere discussion. Surely no one can be naive enough to believe that such a cataclysmic change in the system of government in this country could be accomplished without action as distinguished from words. And the terms used in paragraph (1) of Section 2 to describe

15. Id., 341 U.S. at page 501, 71 S.Ct. 857.

16. Id., 341 U.S. at page 509, 71 S.Ct. 857.

17. 1945, 323 U.S. 516, 65 S.Ct. 315, 89 L. Ed. 430.

18. Id., 323 U.S. at page 540, 65 S.Ct. 315.

19. Ibid. To the same effect are Breard v. Alexandria, 1951, 341 U.S. 622, 641 et seq., 71 S.Ct. 920, 95 L.Ed. 1233, and Giboney v. Empire Storage Co., 1949, 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834.

20. Quoted supra.

the means adopted by the world Communist movement—infiltration into other groups, espionage, sabotage, terrorism—are terms of action. It is a program of action; it involves the Government. It can be met with action by the Government.

The opinions in American Communications Ass'n v. Douds [21] are pertinent. That case concerned paragraph 9(h) of the National Labor Relations Act as amended,[22] which denied the privileges of the National Labor Relations Board to labor organizations unless each officer filed an affidavit that he was not a member of the Communist Party. Sustaining the constitutionality of the provision, the Supreme Court held, *inter alia,* that Congress has power to protect interstate commerce; that Congress had before it a mass of material which tended to show that Communists had infiltrated union organizations to make them a device by which commerce might be disrupted; that the remedy provided bore a reasonable relation to the evil which the statute was designed to reach; that Congress might reasonably find that Communists, unlike members of other political parties, represent a continuing danger of disruptive political strikes; that Congress, not the courts, is primarily charged with the determination of the need for regulation of activities affecting interstate commerce; that the legislative judgment that interstate commerce must be protected from a continuing threat of unlawful strikes is a permissible one; that the Act does not suppress belief nor prohibit those who hold beliefs from engaging in any above-board activity; and that the answer to the implication that if the statute were upheld the power of government over beliefs would be as unlimited as its power over conduct, is that that result does not follow "while this Court sits". The concurring opinions throw much light upon the problem.

It seems clear to us that, if Congress, in order to protect interstate commerce, can validly deny the privileges of union office to members of the Communist Party because of the program of that Party, it can, in order to protect the Government itself, impose restrictions upon adherents of a world Communist movement such as that described in this statute.

So we are of opinion that the field in which this statute lies is one in which Congress can impose restrictions upon First Amendment rights, and that the specific evil at which the statute is aimed is one which justifies remedial steps even though such steps are restrictions upon those rights. There remains the question whether the statutory restrictions go beyond the bounds permitted to remedies for the evil here under attack. We postpone that discussion for the moment. See VI hereinafter.

### IV

Our next consideration is the protection of the Fifth Amendment. Two clauses are involved in the argument —the protections against being compelled to be a witness against oneself and against being deprived of liberty or property without due process of law.

It is said that the revelation of the membership list, required upon registration, would tend to incriminate the members under the Smith Act,[23] and that the revelation would therefore be in violation of the privilege against self-incrimination. But the membership records of an organization are not protected by the privilege. If a grand jury subpoenaed the membership roll of the Party, the custodian of the list, whether or not he was an officer or member, would be compelled to produce. This is made amply clear by United States v. White.[24] In that case a grand jury had subpoenaed an official of a labor union to produce cer-

21. 1950, 339 U.S. 382, 70 S.Ct. 674, 94 L. Ed. 925.

22. 61 Stat. 146 (1947), 29 U.S.C.A. § 159 (h).

23. See Blau v. United States, 1950, 340. U.S. 159, 71 S.Ct. 223, 95 L.Ed. 170.

24. 1944, 322 U.S. 694, 64 S.Ct. 1248, 88 L. Ed. 1542.

tain union records. He declined upon the ground that they might tend to incriminate the union or himself as an officer or individually. He based his claim upon a statute which made it a crime to induce any person employed in certain work to "kickback" part of his compensation. The Supreme Court held that the privilege did not apply. It held, first, that the privilege is essentially **a** personal one, applying to natural individuals only. It then held that the papers which the privilege protects must be the private property of the person claiming the privilege, or at least in his possession in a purely personal capacity, and that individuals acting as representatives of a collective group are not exercising personal rights. The Court said it was unnecessary to determine whether the official was or was not a member of the union, because in any event he could not invoke the privilege. The decision and the opinion apply to the present case. If labor union records are not subject to the privilege in order to protect union members from criminal prosecution, the records of a Communist-action organization, as that term is defined in Section 3 of this statute, are not within the protection. The records of a political party are more "impersonal" than are the records of a labor union.

That the records of the Communist Party are covered by the ruling in the White case is established by Rogers v. United States.[25]

■ The Party argues that the registration provisions of the statute before us do not call for the production of books or records but require the preparation and submission of a registration statement. That statement must contain (Section 7(d)) the name and address of the organization, the names and last-known addresses of the officers and members, an accounting of moneys received and expended, and, in the cases of officers and members who are known by more than one name, such other names. The Party says that such a statement is protected by the privilege even though books and records are not. But membership lists and accountings for money furnished by an organization are reproductions of or extracts from organization records. And if the records can be compelled oral testimony "auxiliary to the production" can be compelled.[26] Whether such records are kept formally or informally is immaterial. No additional explanatory testimony is required by this statute.

■ Moreover Congress could . require Communist-action organizations to keep membership lists and accounting records. The opinion in People of State of New York ex rel. Bryant v. Zimmerman[27] establishes that proposition. The provisions of this statute in effect make such a requirement. The Government requires many organizations to keep records. For example, it required all business houses to keep price records when prices were under Government control. To say that a Communist-action organization, as that term is defined in this statute, could not be required to keep records of its membership and its moneys is wholly untenable in our view. If these are matters of which organization records could be required, they fall squarely within the rule in the White case, supra.[28] As to a registration statement we think the White case applies.

■ Under the White case no privilege exists as to organization records —even for the individual who produces and signs them. But, even if the White case did not apply, the privilege would

25. 1951, 340 U.S. 367, 71 S.Ct. 438, 95 L. Ed. 344.

26. United States v. Field, 2 Cir., 1951, 193 F.2d 92, certiorari dismissed, 1952, 342 U.S. 908, 72 S.Ct. 303, 96 L.Ed. 679.

27. 1928, 278 U.S. 63, 72, 49 S.Ct. 61, 73 L.Ed. 184. And see Shapiro v. United States, 1948, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787, and cases there cited.

28. Wilson v. United States, 1911, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771. See discussion at 68 Harv.L.Rev. 340 (1954).

protect only the person called upon to sign or swear to the statement, and would protect him only in so far as his own name was involved. The privilege would not protect all members against one person's swearing that they are members, or protect one person against swearing that persons other than himself are members.[29]

We assume for a moment, *arguendo*, that the White case does not apply here. We have, then, the problem of the individual who is required to sign the organization registration statement as an executive official of the Party. See Section 7(h) of the statute. By that act alone, even if he were to omit his own name from the list, he would be admitting that he is a member and an officer of the Party. We must make definite the question here posed. It is whether an order directing an organization to register is invalid because the officer who would be required to sign the registration statement would thereby be admitting a membership which might be a basis for a prosecution against him.

The statute provides (Section 4(f)) that the fact of a registration cannot be admitted in evidence in any criminal proceeding and that mere membership in a registered organization is not a violation of any criminal statute. No person called upon to sign is in danger of a prosecution which depends upon the bare fact of registration. So the protection here discussed is against the fringe effects (e. g., a lead to evidence of some offense not premised upon mere membership) of signing the statement.

Several considerations are pertinent. In the first place the privilege against self-incrimination is a privilege which must be explicitly claimed. This rule has been firmly established.[30] We are urged to create an exception of law for the present case, but we see no justification for doing so. Then, since the privilege must be claimed in order to bring it into play, it is by no means inevitable that a conflict would ensue between this order for registration and the privilege clause. We do not know as of now that the executive officers of the Party would claim the privilege; they might not. The only incriminatory results flowing from the act of signing would be corollaries to the fact of membership in the Party. This record shows that the Chairman and the Executive Secretary of the Party have never attempted to conceal their membership or their places of leadership. On the contrary they have proclaimed it often and publicly, both in writing and in speaking. We have no basis for assuming that they would claim protection against a mere revelation of their membership.

It is suggested to us that a statute or administrative order which places an individual in a position where he must claim his privilege in order to avoid incriminating himself is invalid. It is said claiming the privilege is incriminatory and so to force a person to claim the privilege is to force him to incriminate himself. We think the suggestion is not sound. One does not admit guilt by claiming the privilege; he merely says that an answer would tend to incriminate him, which means that it might involve him in a criminal proceeding.[31] Moreover, if the suggestion were good law, many avenues of legitimate inquiry would be

29. It might be urged that even if a person has no privilege against revealing his own membership he has a privilege against revealing the names of other members, since the latter revelation might involve him in a conspiracy charge. The contrary was established by Rogers v. United States, supra.

30. United States v. Monia, 1943, 317 U.S. 424, 427, 63 S.Ct. 409, 87 L.Ed. 376;

Rogers v. United States, supra, 340 U.S. at page 370, 71 S.Ct. 438; United States v. Murdock, 1931, 284 U.S. 141, 148, 52 S.Ct. 63, 76 L.Ed. 210.

31. This is the tenor of federal cases from United States v. Burr, C.C.Va., 1807, 25 Fed.Cas. 38, No. 14,692e, down to Hoffman v. United States, 1951, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118.

shut off. For example, the statutes imposing punishment for refusal to answer questions would be invalid, because they compel people to claim the privilege.

In the second place it is by no means certain that all the executive officers of our petitioner Party have any privilege in respect to the fact of their membership in the Party. The precise provision of the Constitution is that no person shall be compelled to be a witness against himself in a criminal proceeding.[32] Practical considerations, obvious on the face of things, caused the courts to extend that language from its literal content to cover any compulsion to speak where the result would tend to incriminate. But an essential element in the latter doctrine is that the spoken matter would reveal or disclose something, or supply a needed confirmation of something suspected or only partly known. This is a note clearly struck in the cases dealing with the subject.[33] The Supreme Court said in the Rogers case:[34] "Since the privilege against self-incrimination presupposes a real danger of legal detriment arising from the disclosure, petitioner cannot invoke the privilege where response to the specific question in issue here would not further incriminate her."

The constitutional provision is not an empty legalism. It is a realistic barrier between the obligation of a citizen to give evidence and the injustice of inquisition by force. It was designed to achieve a precious protection. But, when it has no factual purpose under given circumstances, no reason exists for its application. If a required word does not in fact tend to incriminate the compelled witness, to interpose the barrier to the otherwise proper process of the law would be to make a mockery of a valued instrument. We turn to the facts before us. Some of these executive officials have been convicted and have served their sentences under the Smith Act, because they organized the Party.[35] Some of them, as we have said, have many times in public print and places asserted membership in the Party. Two members of the National Committee of the Party came forward voluntarily and testified in the proceeding at bar, stating that they are members. In no event could one of these persons be compelled to take the stand as a witness against himself in a criminal case; but in a non-criminal proceeding could he be required to state something which would not in actual fact be a valuable link in a prosecution against him? We do not decide the point, but we note in connection with the suggestion now under discussion that another revelation of the membership in the Party of some of its executive officials may not constitute any real danger of legal detriment to them or tend further to incriminate them. Those officials of the Party may not now have a privilege in respect to their Party membership.

In the next place we do not know and cannot assume what the Attorney General might do under the new Immunity Statute[36] if an executive officer of an organization called upon to sign an organization registration statement had a valid right to the privilege

**32.** See Huard, The Fifth Amendment—An Evaluation, 42 Geo.L.J. 345 (1954).

**33.** Hoffman v. United States, 1951, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118; Mason v. United States, 1917, 244 U.S. 362, 37 S.Ct. 621, 61 L.Ed. 1198; Heike v. United States, 1913, 227 U.S. 131, 143–144, 33 S.Ct. 226, 57 L.Ed. 450; Brown v. Walker, 1896, 161 U.S. 591, 600, 16 S.Ct. 644, 40 L.Ed. 819; United States v. Burr, C.C.Va., 1807, 25 Fed.Cas. 38, No. 14,692e; Ex parte Irvine, C.C.S.D. Ohio, 1896, 74 F. 954.

**34.** Supra, 340 U.S. at pages 372–373, 71 S. Ct. 438.

**35.** United States v. Dennis, 2 Cir., 1950, 183 F.2d 201, affirmed, 1951, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137.

**36.** 18 U.S.C. § 3486(c), Pub.L.No.600, 83d Cong., 2d Sess., Aug. 20, 1954.

and claimed it. Under that statute the courts have broad powers to grant immunity, upon application of the Attorney General, in proceedings before them involving violations of the statute here involved. We do not decide the validity or meaning of the Immunity Statute, but we note the possibility that under this new act a person under compulsion to sign a statement which would tend to incriminate him might be granted immunity from prosecution.

In the next place, even if the suggestion under discussion were true, i. e., even if one or all executive officials of an organization validly invoked the privilege, so that no one could be compelled to sign the registration, the utmost result would be that the statute and order would be unenforceable. We think they could not be held to be invalid merely because they might conceivably be unenforceable in a given case. The problem of the practicality of enforcement arises when enforcement efforts are made.

The foregoing considerations lead us to a clear conclusion upon the point. We have before us an order addressed to an organization as such; it is not addressed to any individual. We conclude that neither the statute nor the order requiring an organization to register can be held invalid because of the possibility that the person or persons required to sign on behalf of the organization might be called upon to claim a privilege against self-incrimination, or that such a claim if made would be sustained, or that an application for immunity would not be made or would not be validly granted, or that the statute or order might not be enforceable.

Boyd v. United States [37] is urged upon us as contrary to the foregoing views. But we do not so read that case. In the first place it dealt with personal, private papers, and the Court made that fact a key to the decision. The production of private papers and the production of organization papers "differ toto coelo", the Court said. In later cases the Court has emphasized that feature of the Boyd case.[38] In the second place the statute in that case authorized the compulsory production directly for use in a forfeiture case under a criminal statute. In the case before us, as we have sufficiently noted, the revealed membership is not per se a violation of any criminal statute, and the fact of the registration cannot be shown in evidence in any criminal case. We think the Boyd case is not in point here.

The information required on a registration statement as to members with more than one name poses a slightly different problem. In so far as the other names appear on organization records, they are covered by the foregoing. In so far as they are names of persons other than the person signing the statement, they have no privilege in his hands. Whether an individual known by several names, and called upon to sign or swear to a registration statement, is privileged to refuse to reveal his own other names is not before us; decision upon it must await the happening and a claim of the privilege.

United States v. Daisart Sportswear,[39] relied on by the Party, does not apply to the problem before us. It concerned the one individual who tes-

37. 1886, 116 U.S. 616, 6 S.Ct. 524, 29 L. Ed. 746. For a discussion of the Boyd case see 8 Wigmore, Evidence § 2184 (3d ed. 1940).

38. Wilson v. United States, supra note 28, 221 U.S. at page 377, 31 S.Ct. 538; Essgee Co. v. United States, 1923, 262 U.S. 151, 158, 43 S.Ct. 514, 67 L.Ed. 917; Nathanson v. United States, 1933, 290 U.S. 41, 47, 54 S.Ct. 11, 78 L.Ed. 159; United States v. White, supra, 322 U.S. at page 699, 64 S.Ct. 1248; Shapiro v. United States, 1948, 335 U.S. 1, 33, 68 S.Ct. 1375, 92 L.Ed. 1787.

39. 2 Cir., 1948, 169 F.2d 856, reversed on other grounds sub nom. Smith v. United States, 1949, 337 U.S. 137, 69 S.Ct. 1000, 93 L.Ed. 1264.

tified under compulsion and who claimed immunity.

The Party says the requirement of Section 8 of the statute that an individual member register himself as a member violates the protection against self-incrimination and so invalidates the statute. This section provides that an individual member must register himself as a member if an organization finally ordered to register fails to do so, or if upon registering and filing its membership list the organization fails to include the member's name. The section operates when an organization does not register or fails to register accurately. It is an alternate, rather than an attachment, to the registration of the organization. As such it poses a separate and independent problem from that posed by the requirement for organization registration. To reach the problem posed under Section 8 we would have to assume that the Party will not register if it is finally ordered to do so, or that if it registers its membership list will be incomplete. But we cannot make such assumptions. An opinion based upon them would be merely an advisory opinion, which we have no power to render. We have before us only an order requiring the organization to register. Section 8 is separable; if it were held to be invalid its fall would not affect organization registration; it is not before us; its validity is not involved in the order here under review. We do not consider any problems which might be posed by it.

### V

The due process of law clause is the basis for two contentions by the Party. The first is that the application of the sanctions to members of a registered organization deprives those members of rights and privileges solely because of their membership in an organization, and that this violates due process. The second contention is that the statute violates procedural due process.

We come first to the sanctions imposed upon members respecting Government and defense facility employment (Section 5(a) (1)) and applications for passports (Section 6). One must note that the condition upon which these sanctions apply is membership; it is not a mere listing as a member in a registration statement. One of the two provisions refers to "any member of such organization, with knowledge or notice that such organization is so registered or that such order has become final"; the other section contains similar language. Membership in an organization is of course a fact, and if one is actually a member he knows it. The statute before us requires that before these sanctions apply a member must have "knowledge or notice" that the organization has registered or been finally ordered to register. If the organization has registered as a Communist-action organization without an order to do so, it has voluntarily agreed that it is such an organization. If a final order has been entered against it, its nature as such an organization has been determined by full administrative proceedings, fully reviewed by the courts. So notice or knowledge of registration carries knowledge or notice of the nature of the organization; its nature has been either admitted or established. The statute provides for notice to every listed member of a registered organization, and it is to that notice that the statute here refers. If a member has either notice of the registration or knowledge of it through some other means, the sanctions apply to him. Thus there are three requisites for application of the sanctions to members: (1) The person must be a member; (2) the organization must be registered or finally ordered to register; and (3) the person must have knowledge or notice of the registration or order.

There is no novelty in the application of civil prohibitions to members of organizations. For example, an officer, director or employee of a stock investment house cannot be an officer, director or

employee of any Federal reserve bank;[40] and a member of one political party cannot become a member of the Federal Communications Commission if a majority of that Commission are already members of that party.[41]

That a sanction may be imposed upon members of an organization which advocates the overthrow of the Government by force is established by Adler v. Board of Education[42] and Wieman v. Updegraff.[43] In the Adler case the Supreme Court held:

"Membership in a listed organization found to be within the statute and known by the member to be within the statute is a legislative finding that the member by his membership supports the thing the organization stands for, namely, the overthrow of government by unlawful means. We cannot say that such a finding is contrary to fact or that 'generality of experience' points to a different conclusion. Disqualification follows therefore as a reasonable presumption from such membership and support."[44]

In the Wieman case an Oklahoma statute required state employees to take an oath that the affiant was not affiliated with any agency, etc., officially determined by the United States Attorney General to be a subversive organization. The Supreme Court held the statute invalid. The Court distinguished Garner v. Board of Public Works of City of Los Angeles,[45] the Adler case, and Gerende v. Board of Sup'rs of Elections of Baltimore City,[46] on the grounds that in each of those cases knowledge on the part of the employee was implicitly or explicitly required. In Wieman the Court found that the oath would exclude persons solely on the basis of organizational membership regardless of their knowledge concerning the organization. It said: "Indiscriminate classification of innocent with knowing activity must fall as an assertion of arbitrary power."[47]

In Bryant v. Zimmerman, supra, the Supreme Court upheld the validity of a requirement that certain organizations report their membership lists against an attack based upon the due process clause. The discussion is apt here.

We think the requirement in this statute that a member have knowledge or notice of the registration of the organization, which means that he has knowledge or notice of the nature of the organization, before these sanctions apply to him, satisfies the due process clause so that sanctions could be premised upon membership under the doctrine of the Adler and similar cases.

A special argument is made by the Party in respect to the denial of passports by Government officers under Section 6(b). That section provides that officials shall not issue a passport to an individual if they know the individual is a member of a registered Communist-action organization or if they have reason to believe the individual is a member of such an organization. The latter clause gives rise to the problem. Under it an official may deny the passport if he merely "ha[s] reason to believe". If that provision is valid, knowledge on the part of the individual as to the nature of the organization to which he is supposed to belong would not be a requisite for denial of the passport. We do not pass upon the point, because such a situation is not before us; it does not depend upon registration but upon considerations not

40. 48 Stat. 194 (1933), as amended, 12 U.S.C.A. § 78.

41. 48 Stat. 1066 (1934), as amended, 47 U.S.C.A. § 154.

42. 1952, 342 U.S. 485, 72 S.Ct. 380, 96 L. Ed. 517.

43. 1952, 344 U.S. 183, 73 S.Ct. 215, 97 L. Ed. 216.

44. Supra, 342 U.S. at page 494–495, 72 S. Ct. 380.

45. 1951, 341 U.S. 716, 71 S.Ct. 909, 95 L.Ed. 1317.

46. 1951, 341 U.S. 56, 71 S.Ct. 565, 95 L. Ed. 745.

47. Supra, 344 U.S. at page 191, 73 S.Ct. 215.

necessarily even factual. The provision is severable.

In this part of its argument the Party groups with the sanctions just discussed the penalty provided by Section 15(a)(2) for individuals who fail to comply with an individual's obligation to register. But such a penalty does not flow from organization registration; it is an alternate provision, not before us. We do not consider it.

We postpone to Part VI of this opinion consideration of the provisions relating to aliens and denaturalization.

■■■ We have next the question of procedural due process of law. This general question involves several specific questions. Is procedural due process of law afforded: (1) An organization from which registration is demanded? (2) An organization faced with sanctions to be imposed upon it because it is registered? (3) An individual listed, or proposed to be listed, as a member of a registered organization? (4) An individual threatened with sanctions because of membership in a registered organization? (5) An individual threatened with criminal prosecution by reason of membership in a Communist-action organization?

We have already noted that the provision for the registration of an organization, which involves a determination of its nature, complies with procedural due process. In so far as sanctions— identification of mail and broadcasts and denial of tax benefits—imposed upon an organization, registered or ordered to register, are concerned, the due process afforded by the procedure required for compulsory registration constitutes due process as to the results inherent in the registration and applicable to the registering organization as an organization. In so far as the listing of a name of an individual is concerned, the statute contains detailed provisions whereby one who has been listed erroneously or who leaves the organization can secure the removal of his name from the list before the list is made public. It provides for an individual notice of a listing (Section 7(g)), an application to the Attorney General (Section 13(b)), an appeal to the Subversive Activities Control Board (Section 7(g) and Section 13(b)), and review by the courts (Section 14). In so far as the rights of a person who denies the fact of membership are concerned, not only the foregoing procedure in respect to the listing but all other procedures ordinarily open to a person asserting such a denial are left open in this statute.[48] This statute does not negate any procedural rights otherwise available to a person entering upon a factual controversy. We do not attempt to determine here the validity of the administrative procedures ordinarily open to Government employees and to applicants for passports. This statute leaves all such procedures available for the determination of a disputed claim that a person is a member of a registered organization. Neither the Lloyd-La Follette Act,[49] which protects Government employees, nor the Secretary of State's procedural passport regulations [50] are repealed or amended by this Act. This statute itself imposes no restriction upon procedural due proc-

48. The Act as originally passed provided (Sections 5(c) and 6(c) ) that a person who is listed on a membership list in a registration statement and who inaugurates a contest against such listing should not be deemed to be a member of an organization for purposes of the sanctions during the period of the contest and until he has lost and his name has been published as a member. Those provisions were repealed by Section 7(c) of the Communist Control Act of 1954, 68 Stat. 775, 778, and so one who is a member is subject to the sanctions without the interval of immunity. But the presence of such an immunity period is not a due process requirement. Due process is afforded if a person has full opportunity to get off a list and full opportunity to prove he is not a member if he is asserted to be one and thus liable to sanctions or penalties.

49. 37 Stat. 555 (1912), as amended, 5 U.S.C.A. § 652.

50. 22 Code Fed.Regs. Part 51.

ess. Whether some other statute or regulation does so is not now before us. Moreover the courts are open for an ousted Government employee,[51] and would be open to a person denied a passport under the requirement of this statute. The reviewability of the State Department's denial of a passport in ordinary cases is a disputed question[52] because of the official discretion involved. The statute before us neither adds to nor detracts from that general reviewability. But certainly, so far as a denial might be premised upon a mandatory requirement of this statute, e. g., Section 6, the courts would be open for review of the action under the statute. In so far as due process is required preliminary to any damage or inconvenience caused by the publication of a listing of a person's name as a member, the statute protects him from publicity until he has exhausted the process, already described, available to test the presence of his name on the list. In so far as criminal prosecutions are concerned, the statute (Section 4(f)) provides: "Neither the holding of office nor membership in any Communist organization by any person shall constitute per se a violation of * * * any * * * criminal statute. The fact of the registration of any person * * * as an officer or member of any Communist organization shall not be received in evidence against such person in any prosecution * * * for any alleged violation of any * * * criminal statute."

Thus it seems to us that procedural due process is afforded in each of the several situations presented to us for consideration in this respect.

## VI

We come now to examine severally, in respects not already discussed, the restrictions (or so-called "sanctions") imposed by the statute upon registered organizations and their members. This includes the question whether each sanction is reasonably related to the substantive evil at which Congress was aiming, a pertinent inquiry under the First Amendment. See III hereinabove.

When a Communist-action organization is registered the following consequences ensue: (1) No member with knowledge or notice of the registration can have non-elective Government employment or employment in a defense facility (Section 5); (2) no member can obtain a passport (Section 6); (3) organization mail and broadcasts must be identified as originating with a Communist organization (Section 10); (4) alien members are excludable, deportable, and ineligible for naturalization (Sections 22 and 25);[53] (5) tax deductions and exemptions are withdrawn (Section 11); and (6) certain members are subject to denaturalization (Section 25).[54]

■■■ Preliminarily we note that the requirement for registration in and of itself presents no difficulty. It is no more than we customarily require of many organizations, such as lobbyists[55] and foreign agents,[56] and even of doctors, lawyers, restaurants and barbers, who are required to register and obtain

51. See Roth v. Brownell, D.C.Cir., 1954, 94 U.S.App.D.C. —, 215 F.2d 500, certiorari denied, 1954, 348 U.S. 863, 99 L.Ed. —, 75 S.Ct. 89.

52. Note, Passports and Freedom of Travel: The Conflict of a Right and a Privilege, 41 Geo.L.J. 63 (1952); Comment, Passport Refusals for Political Reasons: Constitutional Issues and Judicial Review, 61 Yale L.J. 171 (1952).

53. Carried forward in Sections 212(a) (28) (E), 241(a) (6) (E), and 313(a) (2) (G) of the Immigration and Nationality Act of June 27, 1952, 66 Stat. 185, 205, 240, 8 U.S.C.A. §§ 1182(a) (28) (E), 1251(a) (6) (E), 1424(a) (2) (G).

54. Carried forward in Section 340(c) of the Immigration and Nationality Act of June 27, 1952, 66 Stat. 261, 8 U.S.C.A. § 1451(c).

55. 60 Stat. 841 (1946), 2 U.S.C.A. § 267. See United States v. Harriss, 1954, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989.

56. 52 Stat. 632 (1938), as amended, 22 U.S.C.A. § 612.

licenses. The requirement for an accounting of moneys received and expended is no more than is required of any political party,[57] and since petitioner claims to be a political party we see no invalidity in the application to it of such a requirement. The requirement that a political organization list its members is similar to the customary requirement in the states that persons participating in the activities of a political party, such as primaries, conventions, etc., register publicly as members.

 The provisions respecting employment by the Government are in Section 5 of the statute. Congress has forbidden political activity to Government employees, and the Supreme Court has sustained the enactment.[58] The power in this respect as it concerns members of Communist organizations was specifically sustained in Adler v. Board of Education, supra, as to the public schools. The general power over executive employees was discussed at length in Bailey v. Richardson.[59]

The restrictions upon Government employment are directly related to the substantive evil at which Congress was aiming in this statute. Infiltration of government by world Communist adherents is one of the specified evils recited by the Congress, and certainly a prohibition of Government employment to such adherents is a direct attack upon that evil. Indeed we can think of no more direct relationship than that which would exist between the objectives of the world Communist movement, as it is described in this statute, and the occupation of Government positions by members of a Communist-action organization.

We think the considerations which validate power to forbid Government employment likewise support the power to forbid defense facility employment. The latter employment is sensitive business, and it would be sheer folly to say that the Government cannot close the gates of such facilities against those who are knowingly members of organizations under the dominion of a foreign government.

 The provision respecting passports is in Section 6 of the statute. A passport is addressed to foreign governments and requests for the holder "permission to come and go as well as lawful aid and protection."[60] An American passport, says Hackworth,[61] "indicates that it is the right of the bearer to receive the protection and good offices of American diplomatic and consular officers abroad and requests on the part of the Government of the United States that the officials of foreign governments permit the bearer to travel or sojourn in their territories and in case of need to give him all lawful aid and protection." Only rudimentary reasoning is necessary to a conclusion that the Government may validly decline to confer its diplomatic protection upon, and to request foreign governments to give aid and protection to, a member of an organization operating primarily to achieve the objectives of a world movement such as the Communist movement is defined to be in the statute. Surely a government owes no duty of protection to those who, dominated by a foreign organization, seek its overthrow. Congress can narrow the scope of the passport privilege, so long as the limitation is reasonable.

Under current rules a person must have a passport in order to leave the United States to go outside this hemisphere.[62] It is urged that that is a re-

57. 43 Stat. 1071 (1925), 2 U.S.C.A. § 244.

58. United Public Workers of America v. Mitchell, 1947, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754.

59. D.C.Cir., 1950, 86 U.S.App.D.C. 248, 182 F.2d 46, affirmed, 1951, 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352.

60. United States v. Browder, 2 Cir., 1940, 113 F.2d 97, 98, quoting Borchard, Diplomatic Protection of Citizens Abroad.

61. 3 Hackworth, Digest of International Law, c. 10, § 259 (1942).

62. 22 Code Fed.Regs. §§ 53.1, 53.2.

striction upon liberty and is without due process because unrelated to the congressional purpose. But we need not, and do not, enter upon consideration of that question, because, whatever else a passport may validly do, it serves the purposes enumerated by Hackworth, supra, and that feature is enough to support denial. We think this provision is directly related to the congressional purpose in this statute and is otherwise valid.

■ The provision respecting the identification of mail and broadcasts (Section 10) applies to a registered organization, not to the individual members as such. It requires the mail of such an organization to bear the label "Disseminated by ————, a Communist organization". It requires similar identification of broadcasts. No censorship of content is imposed. Congress has frequently imposed limitations upon the use of the mails [63] and on broadcasting.[64] All paid broadcasting must be identified by the name of the person paying for it.[65] So far as our present petitioner is concerned, there seems little to choose between identification as "The Communist Party", as it would be identified without the statute here involved, and as "a Communist organization", which is what this statute requires. Moreover broadcasting is permeated with a public interest,[66] and surely the people are entitled to know when an organization which falls within the definition of a Communist-action organization in this statute is addressing them over the air. All political parties identify themselves on the air; otherwise their appeals are useless. The only conceivable reason for anonymity of political broadcasting is a purpose of deception, and that purpose is enough to validate a requirement of identification.

All publications relating to candidates for elective office in the Federal Government must be identified, showing the names of the persons, associations, committees and corporations responsible for the publication or distribution, under heavy penalties for failure to do so.[67] Newspapers must plainly mark as "Advertisement" all editorial or other reading matter for which a consideration is received.[68] All agents of foreign governments must identify "political propaganda" sent through the mails.[69] It is difficult for us to perceive much substance in the claim that the provisions for the identification of the mail and broadcasts of an organization finally required to register under this Act are invalid. First principles protect the right of the public to be advised of the identity of an organization found to be promoting the objectives of the world Communist movement, as that movement is here defined.

■ The provisions respecting aliens, which were in Sections 22 and 25 of the statute before us, have been carried forward into the 1952 Immigration and Nationality Act.[70] Under the latter provisions sanctions apply to aliens who are members of organizations registered under the Act now before us. We therefore consider them. That membership in the Communist Party is a valid ground for the deportation of an alien is settled.

63. 25 Stat. 874 (1889), 39 U.S.C.A. § 256; Rev.Stat. § 3929, as amended, 39 U.S.C.A. § 259; Rev.Stat. § 4041, as amended, 39 U.S.C.A. § 732; 52 Stat. 114 (1938), 15 U.S.C.A. §§ 52, 53; 48 Stat. 77 (1933), as amended, 15 U.S.C.A. § 77e.

64. 48 Stat. 1088 (1934), as amended, 47 U.S.C.A. § 315; 48 Stat. 1089 (1934), 47 U.S.C.A. § 317. See Trinity Methodist Church, South v. Federal Radio Commission, D.C.Cir., 1932, 61 App.D.C. 311, 62 F.2d 850, certiorari denied, 1933, 288 U.S. 599, 53 S.Ct. 317, 77 L.Ed. 975.

65. 48 Stat. 1089 (1934), 47 U.S.C.A. § 317.

66. National Broadcasting Co. v. United States, 1943, 319 U.S. 190, 226–227, 63 S.Ct. 997, 87 L.Ed. 1344.

67. 62 Stat. 724 (1948), as amended, 18 U.S.C. § 612.

68. 37 Stat. 554 (1912), 39 U.S.C.A. § 234.

69. 52 Stat. 632 (1938), as amended, 22 U.S.C.A. § 614.

70. See note 53 supra.

by Galvan v. Press,[71] and that it is a valid ground for denial of bail to an alien pending deportation proceedings is settled by Carlson v. Landon.[72] There is nothing on the subject to be added to the opinions in those cases. They rest upon the power of Congress over the admission of aliens and the rights of aliens to remain in this country.[73] The rationale upon which the Supreme Court there validated the proscription of alien members of the Communist Party applies directly to members of any Communist-action organization as defined in this statute. We think those rulings govern exclusion and naturalization as well as deportation and bail.

Section 25 of the statute before us[74] also contained a provision respecting denaturalization, which was carried forward as Section 340(c) of the Immigration and Nationality Act of June 27, 1954.[75] It established as *prima facie* evidence[76] in a denaturalization proceeding proof that the person within five years of naturalization became a member of, among others, a registered Communist-action organization. The necessities of proof in a denaturalization case involving foreign allegiance are spelled out in Knauer v. United States.[77] A denaturalization does not flow automatically from registration; a regular proceeding for the purpose must be brought. No such case is before us, and we therefore express no views upon the problem. Its solution must await a specific test.

 The sanctions with reference to tax exemptions and deductions, which are in Section 11 of the Act, forbid income tax deductions for contributions to a registered organization and deny income tax exemptions to such organiza-

tions. These allowances and denials fall within the field of congressional grace so long as a reasonable basis appears. This is too well established to require citation. We think these provisions clearly valid.

 Concluding, then, our discussions of the several provisions applicable to registration and to registered organizations and their members, we find that they are reasonably related to a remedy for the evil depicted in this statute, that the impingement upon First Amendment rights which they effect is not beyond that permissible for the statutory purpose, and that the provisions are not violative of Fifth Amendment rights.

## VII

 The Party makes a number of additional attacks upon the statute as a whole. It says it is an "outlawry" statute. But many valid statutes declare specified activities to be unlawful. The critical questions concerning a so-called "outlawry" statute are whether the matter prohibited is eligible for prohibition and whether the procedures provided protect the rights of those involved. We have discussed those features of this statute.

 The fact, if it be a fact, that no organization could survive registration under the Act is no detriment to the validity of the statute. In the first place, if an organization is actually operating primarily to achieve the objectives of a foreign organization dedicated to the establishment of a totalitarian dictatorship in this country by other than constitutional processes, we perceive no constitutional obstacle to its outlawry. In the second place the inability of an organization to survive

---

71. 1954, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911.

72. 1952, 342 U.S. 524, 72 S.Ct. 525, 96 L. Ed. 547.

73. See Shaughnessy v. Mezei, 1953, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956.

74. Amending Section 305(d) of the Nationality Act of 1940.

75. See note 54 supra.

76. The full phrase is "prima facie evidence that such person was not attached to the principles of the Constitution of the United States and was not well disposed to the good order and happiness of the United States".

77. 1946, 328 U.S. 654, 66 S.Ct. 1304, 90 L. Ed. 1500.

registration under this Act arises, if it does arise, not from the terms of the statute but because of the extreme unpopularity of the revealed foreign domination, of world dictatorship, and of the Communist world leadership. This statute does not forbid any person to be a member of the Party, but the Party says that when its members are identified their livelihood and liberty will be jeopardized. But a statutory requirement is not invalid merely because of results which may flow from the unpopularity of the cause affected. Popularity of men and movements varies with time and place. In some periods of our history friendship with Great Britain was unpopular, and, at other periods friendship with Russia was popular. It would indeed be senseless to propose that popular causes could be subjected to statutory restrictions but that unpopular ones could not be. Unpopular causes are entitled to the privilege of the public arena, but they must sustain the severe burdens of that arena. So long as they are not denied the privilege, they cannot complain that their unpopularity frustrates them or that the observing public visits upon them its displeasure. Stoutness is indeed a requisite for those who would contest in that arena.

 Petitioner urges that the statute contains a predetermination of its nature as a Communist-action organization—a built-in verdict against it. We find no such predetermination. Petitioner is not mentioned. Whether it does or does not fall within the description in the statute is a matter of evidence, just as it is in respect to every other respondent to a petition before the Board. A statute is not necessarily null merely because it fits a known person. Many valid statutes do.

 Petitioner says the statute is a bill of attainder and therefore void. We think it is not. The opinion in the Garner case [78] discusses and disposes

of the point in so far as it relates to Government employ. The remainder of the point is covered by that part of the opinion in Douds in which bills of attainder are discussed. [79] Referring to the familiar cases the Court said:

"But there is a decisive distinction: in the previous decisions the individuals involved were in fact being punished for *past* actions; whereas in this case they are subject to possible loss of position only because there is substantial ground for the congressional judgment that their beliefs and loyalties will be transformed into *future* conduct."

We think that doctrine applies to the case at bar.

## VIII

 The next main subject in our consideration of the statute itself is our petitioner's attack upon Section 13(e). That section enumerates eight evidentiary considerations which it requires of the Board in determining whether an organization is Communist-action within the statutory definition. Petitioner says the section is invalid for lack of due process. It says the provisions are irrelevant, vague, and without any rational relation to the derivative facts to be established.

The eight subparagraphs of Section 13(e) direct the Board to take into consideration "the extent to which" an organization does certain things. Roughly paraphrased these are the extent to which

(1) its activities are performed pursuant to directives or to effect the policies of the foreign government or organization in which is vested control of the world Communist movement;

(2) its policies do not deviate from those of such foreign organization;

(3) it receives financial or other aid from such foreign organization;

(4) it sends representatives to a foreign country for instruction in the

---

78. Supra, 341 U.S. at pages 722–723, 71 S. Ct. 909.

79. Supra, 339 U.S. at pages 413–414, 70 S. Ct. 674.

policies or tactics of the world Communist movement;

(5) it reports to such foreign organization;

(6) its leaders are subject to the disciplinary power of such foreign organization;

(7) it operates on a secret basis for the purpose of concealing foreign domination; and

(8) its leaders consider allegiance to the United States subordinate to obligations to such a foreign organization.

The Party denominates these eight specifications "tests" and, having thus characterized them, attacks them severally and collectively.

The Party says that by the definition in Section 2 of the statute the world Communist movement engages in espionage, treason, etc., whereas none of the eight "tests" to be applied to a domestic organization involves any of those offenses; and that thus the whole of Section 13(e) is irrational. The argument misconceives both the text and the purpose of the section. The inquiry with which the statute as a whole is concerned is in two separate parts: (a) What is the world Communist movement? That is dealt with in Section 2. (b) Is a certain domestic organization under the domination and control of that movement, and does it operate primarily to achieve its objectives? The problem at the first stage of the process is the nature, etc., of a world movement known as Communism. The problem at the second stage of the process is simply whether a named organization operates to achieve the objectives of the world Communist movement, whatever the nature of that movement may be. The so-called "tests" in Section 13(e) are directed at the latter problem, and it alone. Thus construed, as it obviously was intended to be, the section is apt and cogent. We think the division of the inquiry into two steps is a rational one. Certainly it is followed in many types of inquiry.

The Party says the section is too vague to be valid. We find no such infirmity.

The Party says none of the subparagraphs in Section 13(e) specifies how much of any described activity requires a finding of, for example, foreign control; there is no quantitative standard. This argument is an attempt to make out a formula in the statute. But there is no formula. The ultimate finding is to be derived as a conclusion from basic findings. The Board may find full activities in respect to some of these matters, partial activities in respect to some, and a complete absence of activity in respect to some. The Board may make findings in other relevant respects not here enumerated. Having made these several findings, the Board must distil from the composite an ultimate finding whether the respondent is or is not under foreign control, etc. There is nothing unusual about this process; indeed it is quite elementary. It is a familiar process of adjudication based upon fact-finding. Frequently a case discloses numerous basic facts established by the evidence, upon which the trial tribunal exercises its reasoning power and deduces a derivative or ultimate finding. So in the present case.

Moreover this catalog in Section 13(e) is not exclusive. These eight items must be considered, but others which are relevant and of material effect and are offered in competent form must be considered also. Nothing in the statute hints at an exclusive criterion. The Board should, and so far as we can tell did, admit and consider whatever is competent, relevant and material.

The Party argues that evidence merely of the extent to which a respondent does these specified things does not prove or tend to prove any derivative fact in issue, e.g., domination by a foreign government. The argument is clearly without merit. High blood pressure does not prove heart disease, but any competent doctor examining a suspected bad heart would determine

and take into consideration the patient's blood pressure. In legal parlance, evidence must be relevant, i. e., must relate to the issue, and must be material, i. e., must have some weight as proof, but there is no legal doctrine that each separate item of evidence must be conclusive.

Somewhat contrary to the contentions just discussed, the Party asserts that Section 13(e) establishes presumptions and that the presumptions are irrational. We find no presumptions, and we are at a loss as to how one would spell out a presumption from the text. As aids to an ultimate conclusion the Board is directed to take into consideration the extent to which a respondent does certain things. The statute says nothing about presumptions. As we have just pointed out, it does not even specify what quantum or what character of evidence shall produce a given result. The section is a catalog of some basic considerations. There are no statutory presumptions.

The Party argues that under the statutory definition in Section 3 the basic inquiry is whether an organization operates "primarily" to advance the objectives of the world Communist movement, and that the mere "extent to which" the organization operates to advance such objectives is an irrational and irrelevant test. We are not told how the Board could ascertain whether a respondent operated "primarily" in a given manner without taking evidence upon the extent to which it so operated, and we are unable to discern how it could do so.

We next turn to the contentions in respect to the subparagraphs separately, avoiding as much as possible repetition of the general contentions already discussed.

The Party says that the "directives and policies test" in Section 13(e) (1) is irrational. It says that the statutory definition of a Communist-action organization in Section 3(3) refers only to organizations which pursue objectives which are "evil", whereas the test section refers to any objectives, good or bad.

We take it that by "evil" the Party means immediate objectives which are morally wrong. In our view the objectives here referred to need not necessarily be "evil" in that sense. If the organization in question is dominated by a foreign government or organization, as the definition prescribes, and operates primarily to advance the objectives of the world Communist movement, as the definition describes that movement, Congress may well impose upon it the sanctions of this Act, even if the active or immediate objectives are not "evil". Some of the objectives of the Soviet Union and of the world Communist movement may be excellent, even laudable; as to that we express no opinion here. If the Soviet Union has policies of peace and racial equality before the law, as the Party says it has, those are laudable objectives. Our Government has those objectives, as do many other governments. The crucial factor in the statute before us is the aim, spelled out in detail, of the world Communist movement to disestablish our system of government. Our Government may well oppose the establishment in this country of a totalitarian dictatorship of the sort described in the definition, even if such a dictatorship does not meet the definition of "evil" or even if it has many beneficent features.

The Party says the "non-deviation test" in Section 13(e) (2) is vague and irrational. We think it difficult to conceive of a more proper standard for the purpose. In an inquiry as to the domination of one organization by another, the extent of the deviation one from the other in views and policies is both relevant and material; indeed it would be one of the necessary considerations. If there were no similarity, domination would be negatived almost conclusively, whereas, if there were identity, domination would be a definite possibility, if not a certainty. Petitioner says the test includes non-deviation re-

specting policies calculated to secure peace and welfare as well as others characterized as evil. The argument misses the point of this section of the statute. The point is foreign domination; identity of purpose and policy, whether good or bad, is clearly relevant in the proof. Indeed the Board might conclude on this particular phase of its inquiry concerning some domestic organization that it adheres only to the admirable policies of the foreign organization, a partial non-deviation negativing domination. But the possibility of such a conclusion does not nullify the propriety of the inquiry.

Petitioner says that under the non-deviation test a respondent organization could prove its freedom from foreign domination only by proving its failure to adopt any views contrary to those of the Soviet Union. But this paragraph is not limited to absolute identity of views. We repeat once more that these subparagraphs do not constitute a formula for ascertaining foreign domination; they constitute a catalog of required considerations. They involve "the extent to which"—not "whether". So there is no merit in this contention of the Party. Furthermore, even if the statute required consideration of total identity, the provision would be valid, because, if an organization never had any policy which differed from the policies of the world Communist movement, that fact would certainly be pertinent to an inquiry into the relationship between the two. It might not be conclusive, but it would be pertinent.

Subparagraph (3) of Section 13(e) directs the Board to consider the extent to which a respondent receives "financial or other aid" from the foreign government which directs and controls the world Communist movement. The Party says the inclusion in the test of "or other aid" vitiates it. But we think not. Any type of aid received by one organization from another is pertinent to the question whether the one operates to achieve the objectives of the other. Petitioner says that, while it is an ob-

vious truth that a contributor has a lever by which to shape the policies of the contributee, the terms of the donation are the relevant consideration and the bare fact of the donation is irrelevant. We agree that the terms of a contribution are more, even much more, material to the issue of intended influence by means of the gift, but the bare fact of the gift is not irrelevant to the consideration. It does not have the persuasive weight carried by the terms imposed by the donor, but the fact of the gift is certainly an admissible item of proof. Of course it may be explained away, as may any of the statutory specifications of considerations.

The fourth subparagraph under Section 13(e) provides that the Board shall consider the extent to which a respondent sends representatives to foreign countries for instruction in the principles or policies of the world Communist movement. The Party says that the section is invalid, because it fails to require that the Board also consider whether respondent is obliged to or does conform to what its representatives were taught. Certainly, if the Board were to make an ultimate finding of foreign domination upon the basis of bare evidence that respondent sent agents abroad, the Party would be perfectly correct upon the point. But the argument does not go to the validity of the subparagraph as such, but merely points to possible rebuttal proof and to a contention which might be addressed to findings made on this item in a particular case.

We think we need not prolong this opinion by discussing in detail the contentions made by our petitioner, the Party, in respect to the remaining four of the subparagraphs of Section 13(e). They are variations of contentions already discussed, and what we have already said applies to them.

## IX

The Party says that the order of the Board is invalid because the original appointments of members to the

Board were in violation of the Constitution. It says no vacancy had "happened" when the appointments were made, that vacancies did not happen during a recess of the Senate, and that in any event the appointments expired January 2, 1951. The sequence of dates is as follows:

September 23, 1950—Subversive Activities Control Act approved.
September 23, 1950—Congress adjourned or recessed to a day certain.
October 23, 1950—President made recess appointments.
November 27, 1950—Congress reconvened.
November 27, 1950—President transmitted nominations.
January 2, 1951—Congress adjourned *sine die.*
April 23, 1951—Hearings began before panel of three Board members.
August 9, 1951—Senate confirmed nominations.
October 20, 1951—One member retired from panel.
July 1, 1952—Hearings before panel concluded.
July 28, 1952—Briefs and proposed findings filed.
August 6, 1952—Reply briefs filed.
August 14, 1952—Argument before panel.
October 20, 1952—Panel issued recommended decision.
November 21, 1952—Exceptions filed.
November 24, 1952—Exceptions filed.
January 7, 1953—Oral argument before full Board.
April 20, 1953—Report and order of the Board issued. The action of the Board was unanimous, four members signing the order. There was then one vacancy in the membership.

We think we need not discuss this contention of petitioner at length. The minimal effect of any invalidity of appointment upon the final order is obvious from the foregoing table. The appointments were indubitably valid from August 9, 1951. The taking of evidence, which began April 23, 1951, did not conclude until July 1, 1952. The evidence was taken by a panel of members, but it could have been taken by a hearing examiner (Section 13(c) of the Act) and not by a member at all. If prior to confirmation these Board members were merely hearing officers whose taking of the testimony was thereafter ratified by the Board, the proceeding was valid. All findings and conclusions were adopted by a properly confirmed Board after hearing before that Board. The order therefore would be valid regardless of the technical

legal status of the members as members prior to formal Senate confirmation. We see no need to examine further the complicated questions posed by petitioner as to constitutional recess appointments.

## X

We directed the parties to discuss in a reargument the applicability of the Communist Control Act of 1954 [80] to this proceeding. In respects other than those already discussed we think it has no application. Its validity and the validity of the order before us are independent questions. Either might stand without the other.

## XI

We come now to the second main part of the case, consideration of the factual findings of the Board. The problem is whether the Board's ultimate finding that the petitioner in the case at bar is a Communist-action organization within the statutory definition is or is not supported by a preponderance of the evidence in the record.

The statute says that the findings of the Board as to the facts shall be conclusive if supported by the preponderance of the evidence (Section 14(a)). That is a less stringent restriction upon the function of judicial review than is customary in such statutes. By the same token it imposes a laborious task upon the reviewing court. We must ascertain the preponderance of the evidence in respect to the findings as that problem is put to us by our petitioner.

Space does not permit comment upon the evidence on each minute issue of fact, or an attempt here to evaluate particles of the proof. But we can indicate the extent, nature, particularity, and personal character of the testimony presented by the Government, and the nature and extent of the evidence presented by the Party, including the character of both its denials and its explanations.

The Attorney General presented the oral testimony of twenty-two witnesses,

80. Pub.L.No.637, 83d Cong., 2d Sess., 68 Stat. 775.

nineteen of whom had been members of the Party. Thirteen of these nineteen had been members until 1945 or later, four of them as late as 1952. Some of them voluntarily quit the Party, some were expelled, and some were agents of the F.B.I. and acting as such during their membership.

These witnesses testified in large measure concerning practices prior to the disaffiliation of the Party from the International, but each described operations in the Party up to the time of his resignation or expulsion. They stated their views of the reasons for the present concealment of Party matters such as records, membership, etc., and their views concerning the objectives of the Party and its relationship to the world Communist organization and its leaders.

For illustrative purposes we turn to the witness Philbrick. He was an agent of the F.B.I. who from 1942 to 1944 was a member of the Young Communist League and from 1944 to 1949 a member of the Communist Party. Thus his entire period of membership was after the disaffiliation of the Party from the International. He held several positions in the League, becoming state treasurer for its successor organization, American Youth for Democracy. He also held a series of positions with the Party, being a member of the State Educational Commission, chairman of leaflet production; then he was educational director of the Eighth Congressional District, and later a member of the "pro group", an underground group of professional people. He organized and taught Party classes. These classes studied how to apply the Communist Classics to current problems. His membership in the Party was never an open membership; at times he carried a card, and at times he did not. He identified by name a number of the Party leaders and described their activities. He described the operations and purpose of the Party builders' conference and a number of the speakers and speeches. The *Daily Worker*, he said, is the central organ of the Party, and every member is supposed to read it. He described the intra-Party lines of communication between groups or cells, and the caution taken in respect to meetings. The sessions of the cells were devoted to study, literature sales, and collection of dues. As literature director he furnished his cell regularly with copies of *For a Lasting Peace, Political Affairs, The Worker, The Daily Worker,* and many books. A principal topic of discussion in early 1948 was Zhdanov's report, which appeared in the *Cominform Bulletin.* Another topic was Yugoslavia and Marshal Tito. He testified that a member of the Party could not disagree with a position taken by the Cominform and remain a member of the Party. He discussed the study of capitalism in the United States as a developer of wars, and the teaching that "the true patriot is the one who fights on the side of the working class and who fights against capitalism." He testified that the basic objective of the Party while he was a member was "to establish a Soviet State in the United States following, without any deviation, the dictates and the methods laid down by Marx, Engels, Lenin, and Stalin." He did not recall hearing any criticism by leaders of the Party directly against the Soviet Union, or any instance in which, when the policy of the Soviet seemed to differ from the policy of the United States, any leader of the Party appeared sympathetic to the United States.

The testimony of the other witnesses presented by the Attorney General as to the operation of the Party after 1940 covered other phases of the alleged operation, but the foregoing illustrates the specificity and claimed first-hand knowledge from which the witnesses spoke.

On the other side of the controversy, as we have said, the Party presented three witnesses. The testimony of John Gates reveals the tenor of that presentation. In addition to the testimony from Mr. Gates which we have already described, this witness said that he has been a member of the National Committee of the Party since 1945. The immediate objectives of the Party, he

said, are the improvement of the democratic rights of the American people, and peace. The ultimate objective is a revolutionary change, the superseding of the capitalist system by a socialist system. The Party advocates the achievement of these objectives by peaceful and constitutional means. Democratic centralism, the principle which governs Party organization and function, means that all Party policies and programs are formulated by participation of every member, and once the policies are formulated, democratically, each and every member is obligated to carry out the decision. Mr. Gates denied (1) that the Party has since January, 1946, been affiliated with any other organization; (2) that it contributed to the Communist Information Bureau; (3) that any representative of the Party attended any meeting of that Bureau; (4) that any representative of the Bureau ever visited the Party; (5) that the Party ever received any directive or instruction or any written communication of any kind from the Bureau; (6) that the Party received any directives or instructions from *The Lasting Peace*, the newspaper which published information as to what was going on within the various Communist parties throughout the world; (7) that the Party ever received any instructions or directives from the Communist Party of the Soviet Union, or from any representative of that Party, or from any official of the Soviet Union, or from any Communist Party of any other country; (8) that the Communist Party of the United States ever sent any representative to the Soviet Union or to any other foreign country for instruction or training in Communism; and (9) that the Party reported its policies, etc., to the Soviet Government, the Communist Party of the Soviet Union, the Communist International, or the Communist Information Bureau. He stated that the funds of the Party are obtained entirely from dues, annual collection campaigns, and the sale of literature. In respect to the size of the Communist clubs Mr. Gates testified that there were many discussions, that they were interested in bringing about a 100 per cent activity on the part of the membership, that many Communists were being deprived of their constitutional rights, jeopardizing their means of livelihood, and that for those reasons steps were taken to protect the members, reducing the size of the clubs, eliminating lists of members and membership books. He said that the leaders of the Communist Party of the United States recognize no disciplinary power of the Soviet Government, the Communist International, the Information Bureau, or any agent thereof over an American Communist, that American Communists are not bound by any principle or doctrine to execute the decisions of foreign leaders.

Mr. Gates testified the Communists' position is that the national interests of all peoples on earth are identical; that the Party of the United States formulates its policies on the basis of a scientific approach, consisting of the general principles of Marxism-Leninism, which are general scientific principles to be applied in every situation according to time, place and circumstances; that the policies of the Party of the United States are not in many respects similar to the policies of the Party of the Soviet Union, because the circumstances differ, the United States having a capitalistic system and the Soviet a socialistic system; but that the Party of the United States agrees with the Soviet Party on peace. Mr. Gates said that he owed allegiance to the United States and to it alone.

On cross examination Mr. Gates testified that there is a world Communist movement but not of the kind described in the Attorney General's petition. He said that everything he has done is in the defense of democratic rights, economic welfare, and peace, and ultimately in the interest of the establishment of socialism, which is the first stage toward Communism. The Communist International was an actual organization of the world Communist

movement, and the Party of the United States was affiliated with it at one time. He knows of no instance where the *Daily Worker*, while he was editor, supported this government in opposition to the Soviet Union, because it is his opinion that the Soviet has never put forward policies in any way contrary to the interests of the American people. He testified to the same effect in respect to deviation from the policies of Cominform, saying that if the Communists of the United States have expressed no disagreement with the views of *The Lasting Peace* it is because they believe those views have not been in contradiction to the interests of the American people. They consider the Soviet Union to be the outstanding socialist country of the world. To his knowledge the *Daily Worker* has never disagreed with the views and policies of the Soviet Union. It has been stated many times, although not since 1946, that the Soviet Union is the fatherland of the world proletariat. The witness contradicted a statement made by Earl Browder that during the fifteen years of the Browder leadership all major policies of the Party of the United States had the previous knowledge and consent of the international Communist leadership.

▆▆ The Party attacks the credibility of the witnesses presented by the Government. In this connection it stresses that some of these witnesses were employees of the Federal Bureau of Investigation while they were members of the Party, that others were expelled from membership in the Party, and that some were under charges of false swearing. Full opportunity for cross examination of these witnesses was afforded at the hearing before the Board, and full opportunity was also afforded for the presentation of rebuttal testimony. The evaluation of credibility is primarily a matter for the trier of the facts, and a reviewing court cannot disturb that evaluation unless a manifest error

has been made. Moreover the testimony of the witnesses against whom charges are said to have been made was consistent with and supported by masses of other evidence. Petitioner attacks especially the testimony of the F.B.I. operatives, as being without probative weight because they were Government operatives. But we know of no such doctrine. Government agents, especially detectives, are charged with the duty of observing operations to which they are assigned. Their testimony is a commonplace in our courts. We do not consider employment by the F.B.I. or the mere fact of expulsion from the Party as substantial bases for blanket attacks upon credibility. They might be grounds upon which the trier of the facts would receive such testimony with caution, but standing alone they do not constitute so serious a detriment to credibility as to be grounds for reversal.

### XII

We come, then, to consider the disputed issues of fact. Broadly speaking, these issues concern two subjects, (1) the existence and nature of the world Communist movement and (2) the relationship of the Party USA to the world movement. We divide our consideration accordingly.

▆▆ In Section 2 of the Act, as we have pointed out, Congress made findings upon the existence and the nature of the world Communist movement. Some years ago, a difference of opinion existed as to the extent to which courts are bound by legislative findings of facts in cases in which constitutional questions are posed.[81] Since then the Supreme Court has resolved the problem in American Communications Ass'n v. Douds and Galvan v. Press, both supra. The rule, as we understand it, is that, if it appears Congress has power over the subject matter of a statute, and if the findings of fact are not baseless but are based upon extensive investigation, the courts are to adopt those findings.

---

81. See the opinions in National Maritime Union of America v. Herzog, D.C.D.C., 1948, 78 F.Supp. 146.

The opinion in the Galvan case contains the following statement concerning the section, i.e., Section 2 of the Internal Security Act of 1950, which we are now considering:

> "Under the 1940 Act, it was necessary to prove in each case, where membership in the Communist Party was made the basis of deportation, that the Party did, in fact, advocate the violent overthrow of the Government. *The Internal Security Act of 1950 dispensed with the need for such proof.* On the basis of extensive investigation Congress made many findings, including that in § 2(1) of the Act that the 'Communist movement * * * is a world-wide revolutionary movement whose purpose it is, by treachery, deceit, infiltration into other groups (governmental and otherwise), espionage, sabotage, terrorism, and any other means deemed necessary, to establish a Communist totalitarian dictatorship,' and made present or former membership in the Communist Party, in and of itself, a ground for deportation." (Emphasis ours.)[82]

From that viewpoint, and without going further, there is, then, for our purposes in reviewing this order under this statute, a world Communist movement whose purpose it is, by treachery, sabotage, or any other necessary means, to establish a Communist proletarian dictatorship throughout the world.

■■■ However the Board did not rely upon the Congressional findings as to these facts but thought it desirable to make independent findings based upon evidence adduced before it. That evidence was largely documentary. We refer here to a few bits of it.

Communism derives its name from Marx's *The Communist Manifesto.* Basic to present-day Communism is Marxism-Leninism. The meaning of Marxism-Leninism is to be found in the writings of Marx, Lenin, Stalin, and their collaborators, which works are known in this litigation as the "Classics". Marxism is a form of Socialism, the basic tenet of which is the ownership by the state of all means of production and distribution. According to Marx all society consists of antagonistic classes, the principal one being the capitalist class, which, as a result of owning privately the means of production, exploits the property-less working class. Marx expressed particular interest in the property-less factory workers, designated as the proletariat, whose numbers had increased as a result of industrialization. The conclusion of Marx was that the only true value is the labor of the industrial working class. The objective of Communism is to bring capitalism to an end and to substitute for it a dictatorship of the proletariat in a socialist state.

The Communist Party was formed in 1898 in Russia. Lenin, a Russian revolutionist who had adapted Marxism to Russian revolutionary purposes, had a group within the Communist Party called the Bolsheviks. He recognized that two things were most important to the success of the proletariat revolution: rigidity of organization and flexibility of policy. His group of Bolsheviks obtained control of the Communist Party in Russia. Organizationally he held to the necessity of creating a group of disciplined professional revolutionists, among whom no dissent would be tolerated. After the Russian revolutions of 1905 and 1917 the Communist Party destroyed capitalism in Russia and then sought help throughout the world to support their victory. Following Lenin came Stalin, who further advanced the Marxist-Leninist ideas in a practical way.

In his *Problems of Leninism,* published in 1934, Stalin specified as one of the three fundamental aspects of a dictatorship of the proletariat "The utilisation of the power of the proletariat for

---

82. Supra, 347 U.S. at page 529, 74 S.Ct. 737.

the organisation of socialism, for the abolition of classes, and for the transition to a society without classes, to a society without a state." He stressed the necessity for violence, asserting: "But, of course, the dictatorship of the proletariat does not merely mean violence, although there is no dictatorship without violence." He quoted Lenin to the same effect. In his *Foundations of Leninism,* published in 1939, Stalin referred to a phrase used by Marx which seemed to indicate that Marx conceded the possibility of a peaceful evolution in certain countries outside of the European Continent. But, said Stalin, Lenin pointed out that conditions had changed by 1917 and he had then said that the preliminary condition for the revolution "is the smashing, the destruction of the 'ready-made state machine'". Stalin said, "Therefore, Lenin is right in saying: 'The proletarian revolution is impossible without the forcible destruction of the bourgeois state machine and the substitution for it of a new one * * *.'"

In 1919 the First Congress of the Communist Parties, held in Moscow and headed by Lenin, founded the Communist International (called the Comintern), described by the Communists as a new type of international revolutionary proletarian organization. The theses and statutes adopted by the Comintern in 1920 contained the following:

"The Communist International makes its aim to put up an armed struggle for the overthrow of the International bourgeoisie and to create an International Soviet Republic as a transition stage to the complete abolition of the State. The Communist International considers the dictatorship of the proletariat as the only means for the liberation of humanity from the horrors of capitalism. The Communist International considers the Soviet form of government as the historically evolved form of this dictatorship of the proletariat.

 * * * * *

" * * * To all intents and purposes the Communist International should represent a single universal Communist Party, of which the parties operating in every country form individual sections. * * "

The statutes of the International contained the following:

"Sec. 1. The new International Association of Workers is established for the purpose of organizing common activity of the workers of various countries who are striving towards a single aim: the overthrow of capitalism; the establishment of the dictatorship of the proletariat and of the International Soviet Republic; the complete abolition of classes, and the realization of socialism—the first step of Communist Society."

And also, among the theses and statutes of the Third International, the following expressions are to be found:

" * * * Only a violent defeat of the bourgeoisie, the confiscation of its property, the annihilation of the entire bourgeois governmental apparatus, parliamentary, judicial, military, bureaucratic, administrative, municipal, etc., even the individual exile or internment of the most stubborn and dangerous exploiters, the establishment of a strict control over them for the repression of all inevitable attempts at resistance and restoration of capitalist slavery— only such measures will be able to guarantee the complete submission of the whole class of exploiters.

 * * * * *

" * * * It is especially necessary to carry on unlawful work in the army, navy, and police, as, after the imperialist slaughter, all the governments in the world are becoming afraid of the national armies, open to all peasants and workingmen, and they are setting up in secret all kinds of select military organizations recruited from the bourgeoisie and especially pro-

vided with improved technical equipment."

The *Programme of the Communist International,* a publication of the Workers Library Publishers, Inc., contains the constitution and rules of the Communist International. Included in these rules is the following paragraph:

"Party questions may be discussed by the members of the Party and by Party organizations until such time as a decision is taken upon them by the competent Party committees. After a decision has been taken by the Congress of the Communist International, by the Congress of the respective Sections, or by leading committees of the Comintern, and of its various Sections, these decisions must be unreservedly carried out even if a Section of the Party membership or of the local Party organizations are in disagreement with it."

The Comintern was dissolved as an organization in 1943, and four years later a new international organization, known as the Communist Information Bureau, or Cominform, was formed by the Communist Parties in countries of Europe and Asia. There is no evidence of any dissolution of the world movement or of any abandonment of the policies and program enunciated by Joseph Stalin. On the contrary, ample evidence is shown that the movement under its Soviet leaders continues as it was planned.

The foregoing is drawn from a considerable mass of material. Out of the whole of the evidence comes a picture of a world movement which has ultimate objectives and interim objectives. The ultimate objective is a classless, stateless society ruled by the proletariat of the world. The basic concepts of this ultimate objective are that the sole value is labor and that capitalism and nationalism are merely means for exploiting the masses of workers. Thus capitalism and nationalism must be destroyed. In the interim the program calls for a small, hard core of revolutionaries, formed into a disciplined Party in every country, who are a vanguard of workers and fighters for the unorganized and suppressed masses of workers. This Party is to attain control of the government of its country for the purpose of destroying its present form and, ultimately, to weld it into the stateless world society. In this interim operation the Party must be ruthless. When the Party takes over the government it is the expectation that the masses will rise and make the Party government a majority government. In this interim period the present government of Russia, the Soviet Union, because it is the first and biggest government thus far brought into control of the Communists, must be protected and preserved as Communistic at any cost.

The Board made a finding, based on evidence adduced before it, that there exists a world Communist movement substantially as described in Section 2 of the Act. We are of opinion that that finding is supported by a clear preponderance of the evidence.

## XIII

We come, then, to the second main division of the facts. This deals with the policies and program of the Party USA and its relationship to the world movement. The Board, pursuant to the mandate of Section 13(e) of the Act, made findings under each of the section's eight subparagraphs, and these, in due course, we will review item by item. For the moment, however, we observe that some things disclose their nature by set characteristics, basic factors which cannot be ignored. Thus we know fish from fowl. In other words, while all relevant facts are cumulative in delineating a completed whole, it is frequently true in respect to derivative facts that certain underlying basic facts, perhaps few in number, determine the final answer. Such facts are heavy in the scales. This is the situation in the case at bar, and we turn now to consideration of some preponderant basic facts. From the record as a whole six

such facts emerge as a foundation for the ultimate finding.

1. Prior to 1940 the Communist Party USA was a section of the Communist International, the Comintern. No substantial dispute exists as to this area of the past.

The Third Convention of the Party USA, held in 1921, adopted a resolution which read as follows:

"The Communist Party will systematically and persistently propagate to the working class the idea of the inevitability of, the necessity for a violent revolution and will prepare the working class for armed insurrection as the only means for the destruction of the bourgeois state and the establishment of the proletarian dictatorship based upon soviet power."

A Special Convention of the Party USA, also held in 1921, adopted a resolution in which it "hereby reaffirms its position as an integral part of the Communist International" and unanimously adopted the 21 Points for Affiliation with the International.

Among the twenty-one conditions for membership in the International thus adopted by the Party USA were the following:

"12. All parties belonging to the Communist International should be formed on the basis of the principle of democratic centralization. At the present time of acute civil war the Communist Party will be able fully to do its duty only when it is organized in a sufficiently thorough way, when it possesses an iron discipline, and when its party centre enjoys the confidence of the members of the party, who are to endow this centre with complete power, authority and ample rights.

\* \* \* \* \*

"16. All the resolutions of the congresses of the Communist International, as well as the resolutions

of the Executive Committee are binding for all parties joining the Communist International. \* \* \*

"17. In connection with the above, all parties desiring to join the Communist International should alter their name. Each party desirous of joining the Communist International should bear the following name: Communist Party of such and such a country, section of the Third Communist International. \* \* \*

\* \* \* \* \*

"21. Those members of the party who reject the conditions and the theses of the Third International, are liable to be excluded from the party."

At the Eighth Convention of the Party USA in 1934 a manifesto was adopted, which declared, among other things, "The only way out of the crisis for the toiling masses is the revolutionary way out—the abolition of capitalist rule and capitalism, the establishment of the Socialist society through the power of a revolutionary workers' government, a Soviet government."

A delegation from the Party USA attended the Seventh Congress of the International in 1935 and were among those who formally assured Stalin "that the Communists will always and everywhere be faithful to the end to the great and invincible banner of Marx, Engels, Lenin and Stalin. Under this banner Communism will triumph throughout the world."

Thus it is clear that in the years prior to 1940 the Communist Party USA was dominated and controlled by the world Communist movement.

 The problem in dispute, then, is whether the same condition exists in present times. The Party denies that since 1940 it has been dominated or controlled from abroad. It also says: (1) Past history is not relevant or, even if relevant, is not material;[83] (2) the Par-

---

83. The Party makes an argument that only post-Act evidence, i. e., evidence relating

to activities since the enactment of the statute, is pertinent in the present pro-

ty USA was disaffiliated from the Comintern in 1940; and (3) the witnesses who testified to various features of recent operations by the Party were devoid of credibility. We discuss these contentions *seriatim*.

The past is clearly pertinent to the present nature of a person or an organization. Surely a person's education and experience are pertinent to his present nature. The same is true of an organization. As a matter of fact it is rarely, if ever, possible to prove present nature by some instantaneous, contemporaneous fact, totally ignoring the whole of the past. Not only is the past clearly pertinent, it may be quite material to a determination of present nature. Whether it is material depends upon whether there is affirmative evidence of a departure from the established past. In the ordinary affairs of life and in ordinary litigation, if a person or an organization is shown to have had over many years a certain policy and program, and no more is shown, the conclusion is clearly indicated that he or it has the same policy and program in the present. He may prove that he has changed, and in the light of such evidence the past may lose its materiality. We are of opinion that the past nature of the Party USA is pertinent to the present inquiry and that it may or may not be material, depending upon the evidence showing a departure from the past.

In line with the thought which we have just indicated, the Party says that it disaffiliated itself from the Communist International in 1940. It concludes from that fact that the established nature of its past cannot be considered in determining its present nature. But there are flaws in that contention. The disaffiliation was an organizational separation. The international organization itself was disbanded in 1943, but the world Communist movement did not then cease to exist. The movement, intact both in theory and in program, continued to exist. Stalin was the leader of the Communists long after the Comintern ceased to exist, and he, as we have noted, was the successor to Lenin and protagonist of the ideas of Marx and Lenin. To demonstrate a changed nature in the Party USA, some assertion of a change in substantive belief and program would have to be made. No such evidence was presented by the Party. The tenor of its proof was that the Communist movement is not as this statute and the Attorney General's petition pictured it. The Party witnesses did not assert a cleavage in policy or program between the Party and the international movement. At the time of the disaffiliation the convention of the Party declared that this action was "for the specific purpose of removing itself [the Party] from the terms of the so-called Voorhis Act",[84] "which law would otherwise tend to destroy, and would destroy, the position of the Communist Party as a legal and open political party of the American working class." The Party's witness Flynn described the event as "a friendly divorce".

We think a mere organizational disaffiliation, without more, does not render evidence of the Party's past immaterial to its present nature.

It seems to us, therefore, that the first major feature of the facts relating to the Party USA is that prior to 1940 the Party was part of the international Communist movement and that, although there was an organizational disaffiliation in 1940, no evidence has been presented which would indicate that since the disaffiliation the Party has repudiated either the policy or the program of the world movement.

2. The Party calls itself the "Communist Party of the United States of America". This is the name specified

ceeding, and that such evidence in this record is insufficient to support the findings. We see no basis for such an evi-

dentiary restriction upon proof as to nature, policies and program.

84. Act of Oct. 17, 1940, 54 Stat. 1201, as amended, 18 U.S.C. § 2386.

by the Communist International as the name by which a Party affiliated with the international movement must be known. The Communist parties in the other countries of the world are certainly motivated by a common cause. They have a common doctrinal basis and a common ultimate objective, and they have an international organization, which today, as we have noted, is known as the Communist Information Bureau, or Cominform. The Party USA is not affiliated organizationally with the Cominform, but it is difficult for us to see why the Party would call itself the Communist Party of the U.S.A. if it were not in fact a part of the Communist movement in theory and program.

3. The present organization of the Party USA resulted from a revulsion on the part of a group of its leaders against what they considered a departure from the program and principles of world Communism. In 1944 the Party underwent a reorganization under the leadership of Earl Browder. It became known as the Communist Political Association; it de-emphasized some Marxism-Leninism principles and advocated a peaceful coexistence of the United States and the Soviet Union. In the spring of 1945 a French communist by the name of Duclos published an article severely criticizing the attitude and action of the Communists in this country. Following that publication a leading Soviet Union Communist, Manuilsky, being then in San Francisco, expressed to the American Communist leaders the view that the Party USA should follow the counsel of the French Communists. Browder's leading antagonist in the Party councils was William Z. Foster, who attacked Browder as preaching anti-Communism, as fighting the Communist Party, and as being a "revisionist". For some years prior to 1940 Foster had been an official of Communist International. In July, 1945, the Communist Political Association was reorganized into the Communist Party of the U.S.A., Browder was ousted, and Foster was made the National Chairman of the Party. Six of the present leaders of the Party were members of the delegation to the convention of the International in 1935 and participated in the declaration of fealty to Stalin.

4. The amended answer of the Party says that Marxism-Leninism is basic to the Communist Party USA. And, as we have pointed out, while the tenets of Marxism-Leninism, forcefully set out in the writings of Marx, Lenin and Stalin, permit a wide flexibility in tactics, that is, of intermediate activities and objectives, they admit of no deviation from the ultimate objective, which is a classless, stateless world. If the Communist Party USA does not adhere to the basic ultimate objective of Marxism-Leninism, some vivid evidence to that effect should be readily available. Such a position on the part of the Communist Party USA would be a noteworthy fact, which surely would be reflected somewhere. But this record contains no such evidence.

In this connection the Party points to the preamble to its constitution, adopted in 1948, which contains the following sentence: "The Communist Party upholds the achievements of American democracy and defends the United States Constitution and its Bill of Rights against its reactionary enemies who would destroy democracy and popular liberties." But that recitation must be viewed in the light of the established position of Communist leaders that American democracy has gone far in protecting the rights of minorities and of working people and in advancing the economic status of such people, and that in that respect American democracy receives the plaudits of those leaders. But that position in no way negates the ultimate stateless world objective of the Communist movement. Further in this connection it is interesting to note the description of the intermediate program of the Party USA, as described by the Party through its witness Gates. Mr. Gates testified that the historic mission of the working class is the establishment of socialism; that the Party USA advocates the peaceful and constitution-

al road to socialism; that it advocates a party composed of a coalition of all exploited classes and believes that this party will win an election but that the monopolists will not accept this result and will use violence to overthrow the people's government; that the new government should take measures to anticipate this violence and should remove from the army, navy, and police force all generals, etc., who are sympathetic to monopolists, and replace them with officers who are sympathetic to the cause of the common people; that thus the peace government would be forced by necessity to take revolutionary measures to prevent its overthrow; and that this process is in no way contradictory to the principle of dictatorship of the proletariat.

5. We note next, without discussion, that the evidence shows that the Party press, the *Daily Worker*, follows the views of the publication of the Cominform, which is known as *The Lasting Peace*.

6. The next outstanding feature of the proof is an elaborate demonstration in the evidence presented by the Government that the Party USA has never differed in policy or program with the Soviet Union. Most notable in this evidence was the meticulous portrayal of many major international questions upon which the United States Government and the Soviet Union have differed, and the striking fact that in every such instance the Party USA has supported the position of the Soviet Union. Examples of such matters are the Truman Doctrine, the Marshall Plan, ECA, the North Atlantic Pact, control and inspection of atomic energy, the seating of Yugoslavia in the United Nations Security Council, the representation of China in the United Nations, the peace treaty with Japan, the William Oatis case, and the Korean War. The Party has consistently adhered to the view of the Soviet Union that the United States is an imperialistic nation which seeks world domination. Quite vivid is the identity of the course of the Party USA with the course of the Soviet Union when the latter's course changed abruptly. The Party denounced Fascism in Nazi Germany until the Hitler-Stalin Pact in 1939, when the Party switched to the Soviet Union position. When the Pact was abrogated in June, 1941, and Hitler came into conflict with the Soviet Union, the Party promptly switched its attitude and thereafter urged that World War II was a just war. The Party strongly opposed lend-lease aid to Great Britain. It took the same position as did the Soviet in 1947–49 in regard to the internal situation in Greece, and in 1948 in respect to the Czech government. Its course precisely paralleled the Soviet Union's actions in respect to the Tito government in Yugoslavia, including an abrupt reversal of attitude in June, 1948, when the Cominform attacked Tito. At each stage the Party supported the Soviet position in respect to the blockade of Berlin in 1948. Of current significance is the testimony and documentary evidence establishing that the Party USA and the Soviet Union express the same views regarding Korea. Both maintain that the Syngman Rhee government is a reactionary "puppet regime"; both vigorously condemn the hostilities in Korea as the direct result of imperialism and aggression; and both insist the United Nations police action was illegal and aggressive toward North Korea.

The Party does not deny the facts of the identity of the program and policies of the Soviet Union and of the Party. It makes two contentions in respect to them. In the first place it says the statutory phrase "do not deviate from" (Section 13(e) (2)) is the sole pertinent inquiry in respect to identity of views and policies, and that that phrase has reference only to instances where the Soviet Union first adopted a policy and the Party thereafter adopted it. That is obviously an untenable argument. The statutory phrase refers to identity or coincidence and not to chronological adoption. In the second place the Party, through its

witnesses, says that the identity of views of the Soviet Union and the Party is a coincidence. Thus the witness Gates testified that while he was editor of the *Daily Worker* he could think of no instance where that paper supported this Government in opposition to the Soviet Union; that this was because the Soviet Union has never put forward policies in any way contrary to the interests of the American people. He said that if the Communists in this country have expressed no disagreement with the views of the Cominform it is because they believe those views have not been in contradiction to the interests of the American people. He testified that, so far as he knows, the views and policies of the Soviet Union are truly in the interest of the American people. The Party witness Flynn testified to the same effect.

It seems to us that the foregoing six considerations—(1) that the Party was prior to 1940 a section of the Communist International and, although it was disaffiliated organizationally, it presents no evidence of a repudiation of world Communist doctrines; (2) that the Party calls itself the Communist Party of the United States of America; (3) that the present organization of the Party had its origin in a revulsion against a departure from the world Communist program; (4) that Marxism-Leninism is basic to the Party; (5) that the Party's press follows closely world Communist views; and (6) that the policies of the Party and its views upon all issues have for years been identical with those of the world Communist leaders—are the key considerations in the inquiry as to the relationship of the Party to the world movement and its leadership.

### XIV

We turn next to the mandate of Section 13(e) of the statute and to the findings made by the Board pursuant to it.

Petitioner attacks all these findings first upon the same grounds as were its attacks upon these subparagraphs as parts of the statute itself. We have discussed those contentions in detail in discussing the statute. Petitioner also attacks severally the findings under each subparagraph of the section.

Proceeding under the requirement of Section 13(e) (1) the Board made an elaborate examination of the policies and directives of the Party, devoting to the subject almost 130 pages of the printed report. Its conclusions are stated in eleven paragraphs. In substance they are that the Party's organizational forms are based upon directives of the Soviet Union and are carried out to effectuate the policies of the world Communist movement; that by the acceptance of democratic centralism the Party subjects itself to the authority of the Soviet; that the Party advocates the overthrow of imperialist governments, including the United States; and that the major programs of the Party are set forth by the Soviet for the accomplishment of the objectives of the world Communist movement. Without recapitulating or reciting the multitudinous bits of evidence which underlie these findings, we simply state that in our view a clear preponderance of the evidence supports them. As we have made clear, there is scarcely a dispute as to the period prior to 1940, and there is ample evidence in this record as a whole, when balanced against the proof offered to the contrary, to support their accuracy as to the present.

The Board found that the Party invariably follows the views and policies of the Soviet Union (Section 13(e) (2)). We have already discussed non-deviation as one of the chief items of evidence in the case.

The Board found, pursuant to Section 13(e) (3), that, until the disaffiliation of the Party from the International, the Party received substantial financial aid from and at the direction of the Soviet Union and the International, but that since 1940 only one incident of such aid was shown by the record. The evidence in support of that finding is overwhelming. Indeed it is not seriously

controverted. The Party's chief defense on this point is that the evidence is not relevant, a legal question we have discussed.

■ The Board found (Section 13(e) (4) and (5)) that prior to the outbreak of World War II the Party USA sent many representatives to the Soviet Union and they were trained there in Communist policies and program; and that there is no substantial evidence that such representatives were sent after the outbreak of that war. The latter conclusion is not disputed, of course; the former is overwhelmingly established. However the Board found that the Party reports to the Soviet Union, largely through representatives of the Soviet in this country. The Party's witnesses categorically denied this claim as it was presented to the Board by the Attorney General. There is little doubt about these reports having been made when the Party was a member of the International; such was one of the "conditions" of the International. There is some doubt that a preponderance of the evidence supports the broad conclusion that the Party "reports to the Soviet Union and its representatives." Such a conclusion seems to imply constant, systematic reporting as of now. The evidence indicates instances, as in the cases of Eisler and Peters. On this record we would strike this finding as phrased. There is a preponderance of evidence, we think, to support a conclusion that upon occasion leaders of the Party report to representatives of the Soviet Union.

■ The Board, pursuing Section 13 (e) (6), found that an iron discipline exists throughout the world Communist movement, which requires unquestioned devotion to the program laid down by the Soviet Union, and that the Party has recognized and accepted that requirement. The Party's witness Gates denied that the leaders of the Party USA consider themselves subject to the disciplinary power of the Soviet Union or of any international Communist agency.

The requirement of iron discipline within the Communist movement is one of the basic principles of the movement. It is the "democratic centralism" so vigorously insisted upon by Communist leaders in both speeches and documents. The evidence offered by the Government upon the point included the Classics, many publications, categorical assertions by witnesses on the stand, and incidents in which those who departed from the Communist program were expelled from the Party, including, among others, the experiences of Gitlow in 1929, Kornfeder in 1934, Johnson in 1940, Lautner in 1950, Tompkins in 1951, and the demotion of Browder in 1945. Identification of the Soviet Union as the leader of the world Communist movement is amply shown. It appears in documents taught in Party classes, in Communist publications, in oral testimony, and in circumstances such as the pledge of fidelity to Stalin by the International convention. We think the finding on this point is supported by a clear preponderance of the proof.

■ With respect to operations on a secret basis, referred to in Section 13(e) (7) of the Act, the Board made findings on a number of such practices, including concealed membership, refusal to reveal information, secretion of records, deceptive language, the use of aliases, the use of codes, false swearing, secret meetings, reduction of committee memberships, assignment of members to small groups, underground plans and operation, and the infiltration of other organizations. There is no serious dispute as to the facts in respect to these operations. Indeed the Party's witnesses testified to many of them, and the amended answer impliedly admits them. The dispute centers about the purposes of the practices. The Party contended, and now contends, that it was forced into these practices in order to protect the constitutional rights of its members to speak and to assemble, and to safeguard them from social and economic persecution. The Government says that these practices were for the purpose of con-

cealing an unlawful conspiracy. The Board concluded that the practices were undertaken for the purposes of concealing the true nature of the Party and of promoting its objectives.

This question, whether the secret practices of the Party are for the purpose of protecting the liberties of the members or are for the purpose of promoting the objectives of the Party, is a nebulous one. The two purposes may well overlap. In so far as protection of its members from public identification as Communists also promotes the objectives of the Party, both purposes could exist together. In a doubtful situation such as that on this point, we strike the finding as to purpose. At the same time we are of opinion that the Party's view of the limited purpose of secrecy is not shown by a preponderance of the evidence. On this point we conclude simply that a defined purpose is not proven.

■ The Board found (Section 13 (e) (8)) that the purposes of the Party are the antithesis of allegiance to the United States and that the Party's leaders and members consider the allegiance they owe the United States as subordinate to their loyalty and obligations to the Soviet Union. The evidence on this point is long and in great detail. Considerable testimony was given that at Communist schools students were taught that a just war is one in which the Soviet Union has as an adversary an imperialist power, that from the standpoint of a war against the Soviet Union the war is an unjust one for the adversary, and that Party members must adhere to the Soviet Union in any just war. Certainly it is clear beyond question that the Party USA regards the Government of the United States as an imperialist government, and the ultimate essence of the Communist movement is the overthrow of imperialist governments. Certainly prior to 1941 the leaders of the Party USA declared fealty to the Soviet rulers, and the same men are now leaders of the Party. *The Communist Party Manual on Organiza-* *tion,* written by J. Peters and published by the Workers Library Publishers, contains this statement:

"The Communist Party rallies the masses against imperialistic war and fascism, and for the defense of the Soviet Union.

"The Soviet Union is the only fatherland of workers all over the world. * * *"

Certainly it appears that the Communists bitterly assail the Socialists for advocacy of a peaceful path to power. Repeatedly in Communist publications appears the phrase "the Workers' Fatherland, the Soviet Union," or similar phrases.

The Party relies chiefly upon the text of its constitution and the testimony of the three witnesses whom it presented. The witnesses denied that they owed allegiance to any government except the United States.

The use of the term "allegiance" in connection with a relationship to the Soviet Union injects some confusion into the discussion upon this point. Allegiance implies the formalities of the oath of citizenship, the necessities of military service, etc. Of course citizens of the United States have no such "allegiance" to the Soviet. But the statute itself is not confused upon the matter. It refers to the extent to which members of an organization "consider the allegiance they owe to the United States as subordinate to their obligations to such foreign government or foreign organization." The latter are obligations of a nature different from technical allegiance. The Board accurately phrased the point in its key considerations, saying that the obligations which members have accepted toward the Soviet are completely incompatible with, and the exact antithesis of, allegiance to the United States. We think the conclusion is amply supported.

This opinion is too long to permit of recapitulations. The foregoing recitations will reflect the state of the facts as we find the controlling features to be

shown by the record. When the parts are put together, the picture is clear and forceful.

## XV

 We are of opinion, as hereinabove indicated, that the statute and the order are valid as matters of law. The ultimate finding of the Board was that the Party USA "is substantially directed, dominated and controlled by the Soviet Union, which controls the world Communist movement referred to in Section 2 of the Act; and that Respondent [the Party] operates primarily to advance the objectives of such world Communist movement." We conclude that this ultimate finding is supported by the basic findings which are in our opinion supported by a preponderance of the evidence, and that the ultimate finding is itself supported by a preponderance of the evidence.

The order of the Board will be

Affirmed.

BAZELON, Circuit Judge (dissenting).

Suppose an Act of Congress required bands of bank robbers to file with the Attorney General statements of their membership and activities, and imposed criminal penalties upon their leaders and members for failure to do so. Such an Act would compel individuals to disclose their connection with a criminal conspiracy. No argument could reconcile such an Act with the Fifth Amendment's command that "No person * * shall be compelled in any criminal case to be a witness against himself."

The registration provisions of the Internal Security Act of 1950 are similar.[1] They compel individuals, under criminal penalties, to disclose intimate association with the Communist Party, a disclosure which the Supreme Court has held to be incriminatory.[2] Every "Communist-action" organization must register with the Attorney General,[3] list the names, aliases, and addresses of its members and officers during the preceding twelve months, and account for all money received and spent during that time.[4] The organization must register within thirty days after a final order of the Board,[5] under a penalty of $10,000 for each day's delay.[6] In addition, if it fails to register, § 7(h)[7] requires certain officers to register on its behalf.[8] If the officers do not register within sixty days after the final Board order, § 8(a) requires all individual members to register.[9]

---

1. In 1951, sitting as a member of a three-judge District Court, I voted to deny the motion of the Communist Party for a preliminary injunction. 96 F.Supp. 47. The relief sought by that motion was a stay of the proceeding which the Attorney General had theretofore instituted before the Subversive Activities Control Board. I based denial of discretionary preliminary relief upon a series of estimates of probabilities, which was all we had before us. The Communist Party pointed to nothing in the conduct of the administrative proceedings themselves which would necessarily violate constitutional rights. The issue of coverage remained to be determined by the Board, which might have found that the Communist Party was not a Communist-action organization, and there was nothing in the administrative procedure or in the provision for judicial review which indicated that they were unconstitutional on their face. Since the Communist Party has been found to be a Communist-action organization, the questions posed now are different. Because they are different, as Mr. Justice Jackson said, quoting Baron Bramwell, " 'The matter does not appear to me now as it appears to have appeared to me then.' " McGrath v. Kristensen, 1950, 340 U.S. 162, 178, 71 S.Ct. 224, 233, 95 L.Ed. 173 (concurring opinion.)

2. Blau v. United States, 1950, 340 U.S. 159, 161, 71 S.Ct. 223, 95 L.Ed. 170.

3. Section 7(a), 50 U.S.C.A. § 786(a).

4. Section 7(d), 50 U.S.C.A. § 786(d).

5. Section 7(c), 50 U.S.C.A. § 786(c).

6. Section 15(a) (1), 50 U.S.C.A. § 794(a) (1).

7. 50 U.S.C.A. § 786(h).

8. Section 11.205 of the regulations promulgated under the Act supplements the list of officers who must register. 19 Fed. Reg. 6035-36 (Sept. 18, 1954).

9. 50 U.S.C.A. § 787(a).

Noncompliance by individuals with either § 7(h) or § 8(a) is punishable by a fine of $10,000, five years' imprisonment, or both, for each day's delay.[10]

The registration of the organization, required by § 7(a), must necessarily be executed by some individual or individuals. Congress and the Attorney General have recognized this obvious fact. Section 15(b)[11] punishes "individuals" who willfully falsify or omit a required fact in executing a registration statement required under § 7;[12] and paragraph 6 of the Attorney General's instructions which accompany the registration form for organizations (Form ISA–1) requires the statement to "be signed by the partners, officers, and directors, including the members of the governing body of the organization."

My colleagues recognize that some individual will be "called upon to sign or swear to a registration statement" and may be incriminated by having to disclose his aliases.[13] But they fail to recognize that his signing is a complete though tacit admission that he knows the names of the Party's officers and members, and its organization; that he is himself a member or a confidential employee of the Party; and that he has access to Party books and records. Blau v. United States is decisive of this case. The Supreme Court there held that an admission that one is "employ[ed] by the Communist Party or [has] intimate knowledge of its workings" might furnish a "link in the chain of evidence needed in a prosecution" under the Smith Act and therefore could not be required.[14]

It is true that the present Act does not in direct terms require any individual to execute a statement for the organization during the thirty-day period within which it must register. But of necessity and also by the Attorney General's instructions, the only individuals who can execute a statement for the organization are those upon whom § 7(h) of the Act, supplemented by § 11.205 of the Regulations, places a duty to register for the organization if it defaults;[15] and these officials are subject to the

10. Section 15(a) (2), 50 U.S.C.A. § 794 (a) (2).

11. 50 U.S.C.A. § 794(b).

12. See Note, The Internal Security Act of 1950, 51 Col.L.Rev. 606, 620 (1951), where the author states: "It is obvious * * * that an organization cannot register unless its officers, or other persons designated by the membership, execute a registration statement and continue to make the necessary annual reports."

13. Majority Opinion, 223 F.2d 550.

14. 1950, 340 U.S. 159, 161, 71 S.Ct. 223, 224, 95 L.Ed. 170. The admissions implied in executing the statements for the Communist Party are the very admissions sought from Mrs. Blau: "'Mrs. Blau, do you know the names of the State officers of the Communist Party of Colorado?' 'Do you know what the organization of the Communist Party of Colorado is, the table of organization of the Communist Party of Colorado?' 'Were you ever employed by the Communist Party of Colorado?' 'Mrs. Blau, did you ever have in your possession or custody any of the books and records of the Communist Party of Colorado?' 'Did you turn the books and records of the Communist Party of Colorado over to any particular person?' 'Do you know the names of any persons who might now have the books and records of the Communist Party of Colorado?' 'Could you describe to the grand jury any books and records of the Communist Party of Colorado?'" Id., 340 U.S. at page 160, n. 1, 71 S.Ct. 223. See cases collected 19 A.L.R.2d 388.

15. Under the statute the duty to register falls upon the organization's executive officer, secretary, or the individuals performing the ordinary and usual duties of such officers, and upon such other officers as the Attorney General may prescribe. Under the regulation, "(a) The president, chairman, or other person who is chief officer of the organization. (b) The vice-president, vice-chairman, or person performing similar function. (c) The treasurer. (d) Members of the governing board, council, or body" "jointly with the executive officer and secretary" are made liable to register for the organization after the expiration of thirty days." It will be recalled that paragraph 6 of the Attorney General's instructions specifies that the organizational registration form shall be signed by the organization's "partners, officers, and directors, includ-

severe criminal penalties of § 15(a) (2)[16] if they fail to perform this duty. Since they will be subject to criminal penalties for failure to register shortly after the thirty-day period has run,[17] as a practical matter they are under heavy pressure to prevent it from running.[18] The "compulsion prohibited by the fifth amendment is not alone physical or mental duress, such as comes from unlawful commands and authoritative orders * * *,"[19] "the test being whether all things considered the testimony in question was voluntarily given."[20]

Nor are the compulsory self-incrimination provisions of the Act saved by § 4(f). That section provides that *"the fact of the registration* of any person * * * shall not be received in evidence * * * in any prosecution for any alleged violation of subsection (a) or subsection (c) * * * or for any alleged violation of any other criminal statute."[21] Since this provision merely bars the "fact of registration" as evidence, and leaves the registrant exposed to prosecution for everything to which the registration relates, it does not meet the command of the Supreme Court in Counselman v. Hitchcock. There, as here, a statute prevented use of extorted disclosures as "evidence" in any criminal proceeding but, as the Court pointed out, the statute did not prevent their use "to search out other testimony to be used in evidence * * * in a criminal proceeding." No grant of immunity is sufficient unless it provides "complete protection from all the perils against which the constitutional prohibition was designed to guard."[22] Nothing less than "absolute immunity against future prosecution for the offense to which the question relates" can serve as a "full substitute for that [constitutional] prohibition."[23]

But my brethren say, in effect, that under the doctrine of United States v. White,[24] no officer of the Communist Party can assert the constitutional privilege to avoid giving information about the organization which § 7(a) requires. I do not think the White doctrine can be so applied.

In White an officer of a labor union had appeared before a grand jury in response to a *subpoena duces tecum* but had declined to produce union documents. His mere appearance as a union officer was not, and was not claimed to be, incriminatory. Instead, he invoked the privilege on the theory that the demanded documents were incriminating.

ing the members of the governing body * * *."

16. The officers are subject to a fine of $10,000 and imprisonment of five years for each offense. Any offense is defined as one day's failure to register, so that two weeks' nonregistration could mean a fine of $140,000, seventy years in prison, or both.

17. The designated officers must file the statement within ten days after the organization's thirty-day period has run. Regulations, § 11.205, 19 Fed.Reg. 6036.

18. Cf. United States v. Bell, 6 Cir., 1897, 81 F. 830, 837, where it was held that a witness, although "technically not under the compulsion of a subpoena," had nevertheless been under compulsion in testifying before an "official having the power to compel him to come, if he should be recalcitrant about it * * *."

19. United States v. Bell, 6 Cir., 1897, 81 F. 830, 837; cf. Boyd v. United States, 1886, 116 U.S. 616, 621–622, 6 S.Ct. 524, 29 L.Ed. 746 (holding that it is equivalent to the compulsory production of papers to make their nonproduction a confession of the allegations it is contended they will prove); and see McKnight v. United States, 6 Cir., 1902, 115 F. 972, 981.

20. United States v. Neff, 3 Cir., 1954, 212 F.2d 297, 312.

21. 50 U.S.C.A. § 783(f); emphasis supplied.

22. 1892, 142 U.S. 547, 564, 585, 586, 12 S.Ct. 195, 199, 35 L.Ed. 1110.

23. Ibid. For law review comment asserting the purported immunity to be inadequate, see Meltzer, Required Records, The McCarran Act, and the Privilege against Self-Incrimination, 18 U. of Chi.L.Rev. 687, 724 (1951); Comment, Communist Registration under the McCarran Act and Self-Incrimination, 1951 Wis.L.Rev. 704, 715 (1951).

24. 1944, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542.

The Court replied that he could not "place under the protective shield of the privilege * * * official union documents held by him in his capacity as a representative of the union." [25] The vice of the present statute is not that it compels someone to produce incriminatory documents, but that it *compels someone to identify himself as a Communist Party functionary.* Such identification, unlike identification as a corporate or union official, is incriminatory under the Blau case.[26] That situation was not involved in White; nor in Rogers v. United States, since the witness there had "freely described her membership, activities and office in the Party." [27] This fundamental difference makes the White case inapplicable. There are two further distinctions.

(1) Section 7(d) requires the *preparation of a statement* naming the organization, listing its members and officers (and their aliases), describing the officers' duties and functions, and accounting for money received and spent. Hence incriminating information is, in effect, "forced from the lips of the [executing officer], rather than obtained from the records or books." [28] As the Second Circuit has held, "the production of records must be distinguished from * * * testimony as to what the records would contain, had they been produced." [29]

(2) I do not think the White doctrine applies even as to books and records of the Communist Party, notwithstanding the dictum in Rogers that there is no privilege with respect to the books of the Party. Under the White test, the privilege is unavailable to officers of an organization only when the organization's character is "so impersonal in the scope of its membership and activities that it cannot be said to embody or represent the purely private or personal interests of its constituents, but rather to embody their common or group interests only." [30] The "impersonal" criterion, as discussed by the Court, clearly indicates that unions, other lawful associations, and corporations are to be distinguished from criminal conspiracies.[31]

25. Id., 322 U.S. at page 704, 64 S.Ct. at page 1254.

26. See n. 14 and text, supra.

27. 1951, 340 U.S. 367, 372, 71 S.Ct. 438, 442. In United States v. Field, 2 Cir., 1951, 193 F.2d 109, an official of the Bail Fund Committee of the Civil Rights Congress declined to produce the organization's documents on the ground that to do so would in itself be incriminatory. The argument was rejected by the Second Circuit solely on the ground that earlier, in the same proceeding, he had admitted being a trustee of the fund.

28. United States v. Daisart Sportswear, 2 Cir., 1948, 169 F.2d 856, 862. See Note, The Internal Security Act of 1950, 51 Col.L.Rev. 606, 621 (1951), where the author states: "The execution of a registration statement by an individual would at least require him to confirm and transpose selected material from the organization's records to the registration statement. Since an organization need not keep complete records prior to registration, in many cases the officer would be forced to execute the registration statement by relying on his own knowledge. It is clear that in both instances the officer is doing more than producing records and identifying them. He is disclosing other matters of his personal knowledge."

29. 169 F.2d at page 862.

30. 322 U.S. at page 701, 64 S.Ct. at page 1252.

31. In finding unions similar to corporations, the Court enumerated features common to both which are clearly inapplicable to criminal conspiracies: "Duly elected union officers have no authority to do or sanction anything other than that which the union may lawfully do;" "no member or officer has the right to use [the union's books and records] for criminal purposes * * *"; "the actions of one individual member no more bind the union than they bind another individual member unless there is proof that the union authorized or ratified the acts in question"; and "the members are not subject to either criminal or civil liability for the acts of the union or its officers as such unless it is shown that they personally authorized or participated in the particular acts." 322 U.S. at page 702, 64 S.Ct. at page 1252.

Only by ignoring the history of the decade since White can the Communist Party be equated to an ordinary corporation, union or association. For in that decade it has been established that officers of the Communist Party are engaged in a conspiracy to violate the Smith Act.[32] Since these officers, unlike the officers of "impersonal" organizations, are co-conspirators, bound by the acts of other officers in pursuance of the conspiracy and subject to criminal penalties for such acts, the White case does not touch the self-incrimination problems posed by this Act.

In Boyd v. United States[33] the Supreme Court declared "unconstitutional and void" a statute which merely imposed economic pressure to produce incriminating documents. State courts have invalidated various statutes that compelled self-incrimination,[34] including two that required members of the Communist Party to register,[35] I would do the same with the present statute. Section 14(a)[36] permits a "party aggrieved" by respondent's order to obtain judicial review. Plainly the Communist Party is "aggrieved." Therefore it may challenge the legality of the Board's order even though the constitutional rights invaded are those of other persons and not of the Party itself.[37]

The Government and my brethren would postpone determination of constitutionality until a Communist Party official has declined to register for the Party on self-incrimination grounds. First, they say that an official may register voluntarily. But as I have pointed out, the coercion to register precludes voluntary compliance as a matter of law. In Boyd the Supreme Court held a statutory disclosure requirement "void" although, theoretically at least, someone within its scope might at some time have voluntarily made the required disclosures. Second, they argue that a Communist Party official might suffer no "substantial detriment" either because he had already disclosed his Communist affiliations in other proceedings or because he had already been convicted under the Smith Act. But the privilege can never be lost in any such way. "The privilege is not waived by testimony given in a previous independent proceeding, even in the same case."[38] It is waived only by testimony in the same proceeding. Hence the individuals referred to

32. Dennis v. United States, 1951, 341 U.S. 494, 516–517, 71 S.Ct. 857, 95 L.Ed. 1137; Frankfeld v. United States, 4 Cir., 1952, 198 F.2d 679.

33. 1886, 116 U.S. 616, 638, 6 S.Ct. 524, 536, 29 L.Ed. 746.

34. In re DeWar, 1930, 102 Vt. 340, 148 A. 489 (statute rquiring persons convicted of intoxication to disclose name of person from whom liquor obtained held "unconstitutional and void"); People v. Reardon, 1910, 197 N.Y. 236, 90 N.E. 829 (statute compelling individual to submit to investigation of books and papers kept in private business for purpose of furnishing evidence in criminal prosecution held to violate self-incrimination clause of State constitution); State v. Simmons Hardware Co., 1892, 109 Mo. 118, 18 S.W. 1125, 15 L.R.A. 676 (statute requiring officers of every corporation to inform Secretary of State whether company is violating State anti-trust law held void).

35. People v. McCormick, 1951, 102 Cal. App.2d Supp. 954, 228 P.2d 349; Maryland v. Perdew, 19 U.S.L. Week 2357 (Md. C.C., Allegany Cty., 1951).

36. 50 U.S.C.A. § 793(a).

37. National Coal Ass'n v. Federal Power Commission, 1951, 89 U.S.App.D.C. 135, 191 F.2d 462; Associated Industries of New York State v. Ickes, 2 Cir., 1943, 134 F.2d 694.

38. United States v. Steffen, D.C.N.D.Cal. 1951, 103 F.Supp. 415, 417; see also Marcello v. United States, 5 Cir., 1952, 196 F.2d 437; United States v. Field, 2 Cir., 1951, 193 F.2d 109; United States v. Peckhart, D.C.N.D.Cal.1952, 103 F. Supp. 417; United States v. Malone, D.C.N.D.Cal.1953, 111 F.Supp. 37 (waiver before grand jury held not to bar privilege at trial on indictment returned by same grand jury); Note, 36 A.L.R.2d 1403 (1954). Other state authorities are collected in United States v. Steffen, supra, 103 F.Supp. at page 417, n. 4. See Wigmore, § 2276(4) (3d ed. 1940).

by my brethren as having admitted Communist Party affiliations at the hearing before the Board did not thereby waive their privilege.[39] And the previous conviction of some Communist Party officials confers no immunity upon them from further prosecution based upon later Communist affiliation. Third, it is urged that the privilege "must be specifically asserted at the time a particular question , is asked * * *."[40] But that doctrine applies only where it is not plain from the inquiry itself that incriminating disclosures are demanded.[41] It is plain here. Since any person who comes forward, even to claim the privilege, thereby identifies himself as a Communist Party functionary,[42] to require him to claim the privilege would, in the words of Chief Justice Marshall, "strip him of the privilege which the law allows * * *."[43]

In reviewing administrative action, the court "may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action."[44] Equitable principles,

39. In the three-judge court suit brought by the Communist Party (see n. 1, supra), one of the grounds urged for enjoining hearings before the Board was that to properly defend itself at such hearings Communist Party officials would necessarily have to testify and that such testimony would necessarily entail their admission of Communist Party affiliations. Those officials who testified at the hearing did so only after denial of relief in that suit. Moreover, they testified more than two years ago. A fresh disclosure of continued Party office would clearly constitute a "substantial detriment," particularly in view of the intervening Board determination that the Party is a Communist-action organization.

40. Brief for Government, p. 56.

41. In a judicial or legislative proceeding, where most questions asked will not necessarily require incriminating answers, the tribunal must be put on notice that in a particular instance the Fifth Amendment may apply. See, e. g., U. S. ex rel. Vajtauer v. Commissioner, 1927, 273 U.S. 103, 113, 47 S.Ct. 302, 306, 71 L.Ed. 560, where the Court said: "It is for the tribunal conducting the trial to determine what weight should be given to the contention of the witness that the answer sought will incriminate him, * * * *a determination which it cannot make if not advised of the contention.* * * * The privilege may not be relied on and must be deemed waived, if *not in some manner fairly brought to the attention of the tribunal which must pass upon it.*" [Emphasis supplied.] Similarly, under a revenue statute requiring all taxpayers to give information about their sources of income either in a return or an investigation, the enforcing authorities must be put on notice that as to a particular taxpayer the Fifth Amendment may bar the required disclosure.

See United States v. Sullivan, 1927, 274 U.S. 259, 263 47 S.Ct. 607, 71 L.Ed. 1037, where the Court said: "If the form of return provided called for answers that the defendant was privileged from making he could have raised the objection in the return, but could not on that account refuse to make any return at all." The matter was well expressed by the Seventh Circuit in Murdock v. United States, 1932, 62 F.2d 926, 927: "* * * a citizen from whom information is sought under a statute enacted pursuant to authority granted to Congress by the Sixteenth Amendment may invoke or waive the protection provided by the Fifth Amendment. And likewise the courts will compel the production of information, *subject, however, to the right of said taxpayer to justify his refusal so to do by showing facts that bring him within the protection of the Fifth Amendment.* Thus construed, the statute under consideration is not unconstitutional." [Emphasis supplied.]

42. This is so because the only persons within the class required to act are Communist functionaries. As in the case of the hypothetical bank robber statute, to claim the privilege is to admit that one is within the class to which the statute relates.

43. United States v. Burr, 4 Cir., 1807, 25 Fed.Cas. pages 38, 40, No. 14692(e); see also Hoffman v. United States, 1951, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118, where the Court declared: "* * * * if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee."

44. Ford Motor Co. v. National Labor Relations Board, 1939, 305 U.S. 364, 373,

**582**

even in the absence of a statute providing for judicial review, justify the relief I would grant in this case. Truax v. Raich is in point. There the complainant was an alien employee who was threatened with discharge because of a state statute which penalized only the employer for employing more than a certain percentage of aliens. It did not penalize employees. The Supreme Court held the threatened injury to the complainant brought the case "within the class in which, if the unconstitutionality of the act is shown, equitable relief may be had." [45] And Government officers have been enjoined "from bringing criminal proceedings to compel obedience to unconstitutional requirements." [46]

Since Congress has enlarged the area of incrimination with regard to the Communist Party, and since the Supreme Court has found the enlargement permissible, we must see that the constitutional guarantee against compulsory self-incrimination is co-extensive with the widened danger.

The Fifth Amendment, as Dean Griswold has said, "is a clear and eloquent expression of our basic opposition to collectivism, to the unlimited power of the state. It would never be allowed by Communists, and thus it may well be regarded as one of the signs which sets us off from Communism." [47]

Since I would void the Act on Fifth Amendment grounds, I do not consider the petitioner's other contentions.

59 S.Ct. 301, 307, 83 L.Ed. 221; United States v. Morgan, 1939, 307 U.S. 183, 191, 59 S.Ct. 795, 83 L.Ed. 1211; see Davis, Administrative Law 727 (1951).

45. 1915, 239 U.S. 33, 39, 36 S.Ct. 7, 9, 60 L.Ed. 131. See also Terrace v. Thompson, 1923, 263 U.S. 197, 44 S.Ct. 15, 68 L.Ed. 255; Pierce v. Society of Sisters, 1925, 268 U.S. 510, 45 S.Ct. 571, 69 L. Ed. 1070.

46. Philadelphia Co. v. Stimson, 1912, 223 U.S. 605, 621, 32 S.Ct. 340, 345, 56 L. Ed. 570. See also Ex parte Young, 1908, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714, and cases cited n. 45, supra.

47. Griswold, The Fifth Amendment As a Symbol, Harv.Law School Record (Oct. 21, 1954).